[Filed July 1, 1889.]

THE COMMERCIAL NATIONAL BANK OF OGDEN, RESPONDENT, v. THOS. R. DAVIDSON, APPELLANT, IMPLEADED WITH JEFF. MUNDY, ET AL., AS DEFENDANTS.

SALE OF CHATTELS—SYMBOLICAL DELIVERY.—Where D. executed and delivered a bill of sale to M. & J. of 7,000 head of cattle of a certain age, with the calf crop of said cattle for that year, and also his entire outfit of every description, located in Baker county, etc., and at the same time gave an order on his foreman to deliver the property described in the bill of sale, these acts constitute a sale and a delivery of the property sufficient to pass the title, without further acts of segregation or identification.

CHATTEL MORTGAGE—DESCRIPTION OF PROPERTY.—The description of the property in a chattel mortgage as "all the cattle of one year of age and upwards mentioned in said bill of sale, and said cattle are of the star brand of said D., and are to be branded with a tally brand for their better identification, said tally brand to consist of a bar; said cattle range in Baker county, Oregon, and comprise all of said star brand on the range," etc., is sufficient.

CHATTEL MORTGAGE—POWER OF SALE BY MORTGAGE—FRAUD.—A purchaser claiming title to a chattel by purchase from the mortgagor thereof, stands in the place of the mortgagor, and cannot take advantage of a reservation in the mortgage in favor of the mortgagor to sell the goods in the ordinary course of business on the ground that such reservation is fraudulent, and renders the mortgage void.

---

---

CHATTEL MORTGAGE—FORECLOSURE—EQUITY JURISDICTION.—Under the general powers of a court of equity to foreclose liens upon property, chattel mortgages may be foreclosed by suit in any county where service can be had on the defendant, notwithstanding the statute providing for a foreclosure by an action at law in the county where the mortgage has been filed. *Jacobs* v. *McCalley*, 8 Or 124, followed.

GROUNDS FOR CHANGE OF VENUE.—The court has no authority to change the venue of civil cases except as provided by statute. Hill's Code, § 388.

ABUSE OF PROCESS—PLACE OF TRIAL.—A deception practiced upon the defendant by the plaintiff, by which the former was induced to come within the county where the suit was begun and process served upon him, where no injury was occasioned thereby, is not such fraud as to amount to an abuse of the process of the court for which relief will be granted.

CHATTEL MORTGAGE—DECREE OF FORECLOSURE—PERSONAL JUDGMENT.—On foreclosure of a chattel mortgage upon property in the hands of a purchaser, where it is not alleged or proved that he has disposed of the property, a personal decree against him for the value of any part of the mortgaged property sold or disposed of, or that cannot be produced or delivered by him to satisfy the indebtedness, cannot be rendered.

ATTORNEY'S FEES—*Lex Fori.*—A provision in a note made out of this State, secured by chattel mortgage on property within the State, contained a provision that "if not paid at maturity, ten per cent. additional as costs of collection" should be added, and which provision was valid and binding in the State where the note was made. *Held,* that in a suit to foreclose the mortgage in Oregon, the law of that State governs the application of the remedy and such provision being contrary to the public policy in the State; will not be enforced.

APPEAL from a decree of the circuit court for the county of Multnomah, rendered upon the foreclosure of a certain chattel mortgage.

The appellant, on the 18th day of October, 1886, executed to the defendants, Jeff. Mundy and Nick. Johnson, an instrument in writing, of which the following is a copy:

"POMONA, Kansas, October 18, 1886.

"For and in consideration of the sum of one hundred and thirty-five thousand dollars, in hand paid by Jeff. Mundy and Nick. Johnson, of Pomona, Kansas, the receipt whereof is hereby acknowledged, I hereby sell and agree to deliver to said Jeff. Mundy and Nick. Johnson seven thousand cattle, of the age of one year and over last spring, and also the calf crop of said cattle for the year 1886, and also my entire outfit or band of horses and saddles and bridles and wagons and harness, and all other personal property comprising my outfit, of every and all descriptions, located in Baker county, in the State of Oregon. All of said property is now owned by me, clear and free from incumbrance of any and every kind

and nature, and I will warrant and defend said Mundy & Johnson against all persons lawfully claiming the same. "Witnessed, etc.                    . T. R. DAVIDSON."

Subsequently, and on the third day of November, 1886, Mundy & Johnson, in order to secure the payment of two promissory notes given by them as partners to the respondent, and which were also signed by the defendant John Parkinson, bearing date October 21, 1886, being for the respective sums of ten and fifteen thousand dollars, executed to the said respondent a chattel mortgage, claimed to cover the said cattle referred to in said instrument of writing, and which is the same mortgage decreed to be foreclosed. The description of the mortgaged property in the mortgage is as follows: "All of the cattle, of the age of one year and over last spring, mentioned in a bill of sale dated Pomona, Kansas, October 18, 1886, made by T. R. Davidson to Jeff. Mundy and Nick. Johnson; and said cattle are of the star brand of. said Davidson, and are to be branded with a tally brand for their better identification. Said tally brand to consist of a bar. Said cattle range in Baker county, Oregon, and comprise all of said star brand. Said property is situated on the range of said Davidson, in the county of Baker and State of Oregon." The mortgage was duly filed in the office of the clerk of the county of Baker, Oregon, on the sixth day of November, 1886, and afterwards, on the twentieth day of October, 1887, duly renewed.

On July 1, 1887, a portion of Baker county became, under an Act of the legislative assembly of the State of Oregon, theretofore passed, the county of Malheur; and on October 25, 1887, a certified copy of the mortgage was duly filed in the office of the clerk of the latter county(?). On November 2, 1887, $11,000 was paid to the respondent on the notes, which paid off the $10,000 note, and $1,000 on the $15,000 note; leaving a balance due on the latter note of $14,000. The terms and conditions of the "fifteen thousand dollar note" were to the effect that the makers would pay the same on or before one year after date, with

interest at 10 per cent per annum, payable monthly from date until paid, both before and after judgment, and, if not paid at maturity, 10 per cent additional as costs of collection. It further appears from the transcript that the parties, Davidson and Mundy & Johnson, became involved in litigation growing out of the instrument of writing bearing date October 18, 1886. That Mundy & Johnson commenced a suit against Davidson in the district court of Franklin county, Kansas, and that about the same time the latter commenced a suit against the former in the circuit court of the State of Oregon for Baker county. That said suits were both pending on the twenty-sixth day of June, 1888; at which time the said parties duly made and entered into the following stipulation of settlement: "It is stipulated and agreed by and between the parties plaintiff and defendant in the above-entitled action, pending in the district court of said county of Franklin, Kansas, that the matters and differences between said parties be finally settled on the following basis: The said Mundy & John son to relinquish to said T. R. Davidson all right, title, and interest in the property known as the 'Star Ranch,' and all the personal property thereto belonging, in the State of Oregon, described in the written bill of sale set forth in the petition in said action, subject to all legal incumbrances; the said Mundy & Johnson to dismiss at their cost the above-entitled action in said court. The said Davidson shall deliver up to be canceled all notes, claims, and mortgages securing the same, given to the said T. R. Davidson by said Mundy & Johnson and J. L. Ketchum, and any litigation had by said T. R. Davidson against sa'd Mundy & Johnson, in the State of Oregon, to be dismissed at his cost." It further appeared that at the time of the execution of the said bill of sale from Davidson to Mundy & Johnson of October 18, 1886, said Davidson delivered to said Mundy & Johnson, at the time he delivered to them the bill of sale, a written order upon his foreman in charge of the ranch, of which the following is a copy:

"POMONA, Kansas, October 18, 1886.
"Mr. Theodore Spencer, Baker county, Oregon:   You will deliver to Jeff. Mundy and Nick. Johnson, or their order, all the property as described in my bill of sale to them of even date herewith.

"T. R. DAVIDSON."

The other facts in the case sufficiently appear in the opinion of the court.

*Zera Snow*, for Appellant.

*Williams & Wood*, for Respondent.

THAYER, C. J.—I am satisfied that the bill of sale from Davidson to Mundy & Johnson of October 18, 1886, and the written order from Davidson to his foreman, Spencer, delivered at the same time, operated as a transfer from Davidson to Mundy & Johnson of the title to all the cattle owned by Davidson at the time, and which belonged to the Star ranch.   No one, it seems to me, can read said instruments without concluding therefrom that such was the intention of the parties.   Counsel for the appellant contends, however, that as the bill of sale specified a certain number of cattle—7,000—and as a matter of fact Davidson had more than that number, that, therefore, the cattle agreed to be delivered were not identified, and consequently no title to them was transferred.   If the contract had been to sell a certain number of cattle out of a band consisting of a still greater number, no title, of course, would pass until those bargained to be sold were counted out, or in some manner identified.   The rule of law invoked by said counsel is doubtless correct, but I do not think the facts of the case warrant its application.

Davidson sold and agreed to deliver to Mundy & Johnson 7,000 cattle of the age of one year and over the last spring; also the calf crop of said cattle for the year 1886; and also his entire outfit or band of horses, saddles, bridles, wagons, harness, and all other personal property, comprising his outfit of every and all description, located in Baker county, in the State of Oregon,—for a consideration which

he acknowledged having received. The language of the bill of sale, it will be noticed, is very broad, and exhibits, to my mind, an evident intention upon the part of Davidson to sell and transfer to Mundy & Johnson his entire band of cattle referred to. It may be suggested that if such had been the intent the number of cattle sold would not have been limited in the instrument; that it would in that case have included in express terms all the cattle Davidson had which belonged to said ranch. But it is just as reasonable to suppose that the purpose of the parties in specifying the number of cattle sold was intended as an assurance that Davidson had that number of cattle at least, and that he would deliver so many to the vendees. The circumstances surrounding the transaction clearly indicate that Davidson supposed he had 7,000 head of cattle, exclusive of the calf crop mentioned, and that Mundy & Johnson expected that they were purchasing that number; and it is not very probable that either party anticipated that Davidson would have a remnant of cattle left after Mundy & Johnson had received their complement. Nor was it contemplated that the cattle sold were to be delivered by actual count and identification. They must necessarily have had an extensive range, and it would have required a great length of time and a large amount of labor to "round them up," as it is termed. Davidson himself, when testifying as a witness, said "that it would take two or three years to get up and count them all." I think it is very apparent that only a symbolical delivery of the cattle was contemplated by the parties, and that it was supposed to have been completed when the order given by Davidson to his foreman, Spencer, to deliver to Mundy & Johnson, or their order, the propery described in the bill of sale, was presented by them to Spencer, and acted on by him; and that Davidson's duties and obligations in reference to the affair were fully discharged if the cattle owned by him belonging to said ranch, of the stipulated age, amounted to 7,000 in number. Davidson seemed to have supposed that he had transferred to Mundy & Johnson the property in the cattle, as he subse-

quently sued out of the circuit court for the county of Baker a writ of attachment, in an action against them in said court, and directed the cattle to be attached by virtue thereof, as their property, and in the stipulation of settlement entered into on the twenty-sixth day of June, 1888, a property right in the cattle in favor of Mundy & Johnson is clearly recognized.

These are circumstances which, if necessary, may be resorted to in order to ascertain the probable intention of the parties; but I think that the writings themselves, when executed and delivered, operated as a transfer from Davidson to Mundy & Johnson of a property right in the cattle, and that their subsequent mortgaging them to the respondent was valid and binding, as between the parties to the mortgage and those claiming under them chargeable with notice thereof. It seems to have been regularly executed, and there is nothing upon its face tending to impeach it.

The appellant's counsel makes some question regarding the description of the property, as contained in the mortgage, but I am unable to discover any serious objections to it on that point. It purports to mortgage all the cattle of the age of one year and over the last spring, mentioned in the said bill of sale; specifies that the cattle are of the star brand of said Davidson, and were to be branded with a tally brand for their better identification. That the cattle could be ascertained, under the construction of the bill of sale given herein, there can be no question. It is a notorious fact that ranchmen, although living long distances from one another, know each other's stock much better than many owners thereof who reside in agricultural districts know that of their near neighbors. The former make it a special business to look after their cattle, to know their range, and to keep them from other cattle. I have no doubt that Davidson's cattle could be readily pointed out by almost any one living in the vicinity of their range, and it is probably due to that fact that the bill of sale contained only a general description of them.

Said counsel also insists that a general power of sale of

the cattle in the ordinary course of business was given
to the mortgagors, which was inconsistent with the lien
claimed, and rendered the mortgage fraudulent and void.
Whether the testimony in the case shows that such power
was given is extremely doubtful; but, even if it does, I
cannot conceive how it can avail the appellant.. The reser-
vation of such a power to the mortgagor may render a
mortgage of chattels fraudulent as to creditors, but I am
not able to discover how it could affect any one else. It
would certainly not affect it as between the parties to the
mortgage, nor do I see how it could as to purchasers of
the property from the mortgagor. The purchasers of such
property would, of course, obtain a title to it under the
purchase, not for the reason that the mortgage was void,
but because the mortgagor was given by the mortgagee
the right to make the sale. Creditors, however, occupy a
different position. It has been a well-recognized principle,
from the earliest period of the common law, that a convey-
ance of the goods and chattels of the debtor, not made
*bona fide*, but in trust for the use of the person conveying
them, was fraudulent and void as to his creditors; and in
case of a mortgage a reservation in favor of the mortgagor
of the power to sell the goods and chattels mortgaged in
the ordinary course of business, and for the benefit of the
mortgagor, falls within the same principle.

Said counsel intimates that Davidson occupies in the
affair the position of a creditor; but I do not see how he
can claim that he is such creditor, or has been since the
twenty-sixth day of January, 1888, the time the stipulation
of settlement was made. He may have been a creditor at
that time, but whether he was or not was a matter of ser-
ious controversy between him and Mundy & Johnson.
They finally, however, at said time, adjusted their affairs
by Mundy & Johnson's relinquishing to Davidson all right,
title and interest in the property known as the "Star
Ranch," and all personal property thereto belonging in
the State of Oregon, described in said bill of sale, subject
to all legal incumbrances, and by Davidson's delivering up

to Mundy & Johnson, to be cancelled, all notes and claims and mortgages securing the same, given to him by them and J. L. Ketchum. It is evident, in view of the facts of the case, that Davidson has no alternative, in order to disincumber his property, but to pay off the mortgage in suit. He took back the property from Mundy & Johnson subject to the mortgage, and it remains an incumbrance thereon in his hands, the same as in theirs. To escape its burden without payment baffles all the ingenuity which learned counsel·can employ.

Nor can I discover any irregularities in the bringing of the suit, or error in the refusal of the court to change the venue thereof, authorizing its dismissal or a reversal of the decree appealed from. It was a transitory suit, triable in any county in the State in which the defendants resided or were found, or, if none of them resided in the State, then in any county in the State which the plaintiff might designate in its complaint. This is the general statutory rule upon the subject. Counsel for the appellant has, however, referred to the Act to regulate the foreclosure of chattel mortgages of October 24, 1866, and seems inclined to claim that under said Act the suit is local in its character. But we could not give said Act the construction claimed for it without holding that it repealed or modified the general law regulating the venue of suits, which would be contrary to the holding by this court in *Jacobs* v. *McCalley*, 8 Or. 124. The court there held, in effect, that the two statutes were in harmony. Judge Boise, in delivering the opinion of the court in that case, after giving construction to said Act of 1866, said: "Such a construction will also harmonize the provisions of section 2 with section 410, which provides that 'a lien on real or personal property, whether created by mortgage or otherwise, shall be foreclosed by a suit.' Such a construction will do no violence to the plain meaning of the statute, and will facilitate the administration of justice, and be in harmony with the general principles of the construction of statutes." Said Act of 1866 is a remedial statute, intended to provide another procedure for the

XVIII. OR.—5.

foreclosure of chattel mortgages, and does not repeal or affect the general law regarding the venue of suits, nor any provision thereof not in direct conflict with its provisions.

With respect to the motion to change the venue of the suit, nothing further need be said than that the court in such cases is only authorized to change the place of trial when the suit has not been commenced in a proper county, or where the judge is a party to the suit, or directly interested in the event of it, or connected by consanguinity or affinity within the third degree with the adverse party, or those for whom he prosecutes or defends. Code, § 388. The claim by appellant's counsel that there was an abuse of process in the commencement of the suit arises out of the fact that the respondent's counsel represented to the appellant and his counsel that they were coming to Portland to bring a suit in the United States court to adjudicate the question of the lien, and that appellant and his counsel were thereby, in order to save time and unnecessary expense, induced to come to Portland also, to contest an application for a receiver, or give bond if a receiver should be ordered; that a stipulation was signed, entitled in that court, waiving demand for possession; that when appellant arrived in Portland he was almost immediately served with process from the State court. The appellant resided in Malheur county, Oregon, and claims that he should have been sued in the circuit court for that county if sued in the State court, and that it was a deceit in respondent's counsel in so inducing him to come to Portland. I do not think the facts referred to constitute such a deceit as required the circuit court to set aside the service of the summons upon the appellant. It appeared that the respondent's counsel did intend to bring the suit in the United States court, but when he got to Portland he found that that court had no jurisdiction in such a case, and he therefore brought the suit in the State court for Multnomah county. If the statement of the respondent's counsel was made as claimed by the appellant's counsel, it constituted no ground of deceit. As the appellant was bound

to know whether the suit could be brought in the United States court or not, he should not have allowed himself to have been deceived by a statement which his counsel would have informed him was untrue. But the deception, if there were any, did not prejudice the appellant. He could not possibly have been injured by being sued in Multnomah county instead of Malheur county. In any equity case where the testimony is taken by deposition it can make very little difference where the suit is brought. In this case all the counsel on both sides, who had the management of the suit after it was begun, resided in Portland, and it is very evident that its commencement there was a convenience to all parties.

The appellant's counsel has, however, presented two objections to the decree which I think are well taken. One of them is the allowance against the appellant of the 10 per cent stipulated in the note to be paid if the note were not paid at its maturity, and the other is in regard to decreeing a personal judgment against the appellant. The part of the decree in regard to the personal judgment is to the effect that if the property described in the chattel mortgage, or any part thereof, has been sold or otherwise disposed of by Davidson, or cannot be produced or delivered so as to satisfy the indebtedness, etc., that the respondent have personal judgment against him for the amount, or for so much thereof as may not be satisfied by the sale of the property. It is not alleged in the complaint, or in any of the pleadings, nor found by the referee or court, that Davidson had sold or disposed of any of said property, or that it could not be produced or delivered so as to satisfy the indebtedness, nor was there any testimony given upon that point. How or by whom the facts were to be ascertained, entitling the respondent to such judgment, does not appear. I think it might properly be decreed, where the evidence showed that the party in such case had disposed of the property, that he be required to pay its value, or a sufficient part thereof to make up any deficiency that might be found after applying the proceeds of the sale

of the remaining property to the payment of the debt. Such evidence, however, would only be admissible under proper allegations in the pleadings. A decree of so much importance to the appellant should certainly not be rendered against him without giving him an opportunity to be heard regarding the matter.

The question of the allowance of the 10 per cent is more difficult to determine. It is stipulated in the note to the effect that if it is not paid at maturity the makers will pay 10 per cent additional as costs of collection. Whether such a stipulation can be enforced or not, consistently with the principles of law, is an important subject of inquiry. This court in *Peyser* v. *Cole*, 11 Or. 39, 4 Pac. Rep. 520, held that a stipulation for a reasonable attorney's fee in a promissory note, in event of an action being instituted to collect the note, was valid and enforceable against the maker thereof. The stipulation there was as follows: "And in case suit or action is instituted to collect said note, or any portion thereof, to pay such additional sum as the court may adjudge reasonable as attorney's fees in such suit or action." In *Balfour* v. *Davis*, 14 Or. 47, 12 Pac. Rep. 89, it was held that a provision in a mortgage of 20 per cent for counsel fees on the amount due, in case of a suit, whether judgment should be recovered or not, was in violation of the rule of just compensation, and contrary to the well-settled principles of public policy; and the court refused to allow the plaintiff any additional sum whatever, holding that it would not make a contract for the parties that they had not made for themselves. It was also announced in the opinion delivered in the latter case that the doctrine of allowing attorney's fees in such cases would not be extended beyond the determination of the precise question before the court in the former case of *Peyser* v. *Cole*. The result of these two decisions is that a stipulation in a promissory note, to the effect that, if an action or suit is instituted upon the note, the maker will pay such additional sums for attorney's fees as the court may adjudge reasonable in the action or suit, can be enforced, but that the doctrine will not be

extended beyond that. In other words, the parties can only stipulate for the allowance of such sum as the court may adjudge reasonable as attorney's fees. It may be claimed, with apparent reason, that where the parties fix a just and fair amount for collecting the note, that the court should allow it. But it is not consistent with public policy to permit parties to agree upon such amount. They do not stand upon an equality of footing. The creditor, in a majority of cases, would be too apt to take advantage of the necessities of the debtor. The latter, especially when he desires to procure the loan of money, is not always competent to contract regarding the additional amount to be paid, in case he makes default in the payment of the principal sum. He generally wants the money very badly, and is willing to subscribe to almost any condition in order to get it; but, if it is left to the court to adjudge the additional amount which he is required to pay, an oppressive exaction, in a majority of the cases, will be avoided. It is my opinion that a clause in a promissory note, in the form of the stipulation in question, is not valid, and should not be enforced. The payee may properly require an agreement from the maker of the note that he will, in case an action or suit is instituted to collect it, pay such additional sum as the court may adjudge reasonable as attorney's fees in such action or suit. Agreements of that character are sanctioned by the courts of this State, upon the ground that the holder of the note has necessarily incurred the expense of attorney's fees in collecting it, occasioned by the dereliction of the maker, and, the matter being under the observance and control of the court, the holder may be reimbursed therefor without doing an injustice to the maker. But the courts have not sanctioned the doctrine that the payee may exact from the maker an obligation to pay a positive and certain additional sum, in case of default in the payment of the note, without ascertaining what amount of expense the payee will actually incur in the affair. The sanction of the latter character of agreements, it is apprehended, will be liable to open a door to fraud and extortion.

Counsel for the respondent insists that the stipulation to pay the additional sum contained in the note in suit was valid and binding in the Territory where the note was executed, and that therefore it should be upheld in this State. As a general rule, the law of the place where contracts merely personal are made, governs as to their nature, obligation and construction. But I do not think that rule applies to an agreement, the obligation of which does not arise until a remedy is sought upon the contract, to which it is only auxiliary. In regard to such agreements, the law of the place where they are attempted to be enforced, I should suppose, would prevail. This agreement was to pay the additional percentage as costs for collection of the note, and if the courts where the note was executed would have enforced the agreement, it does not follow that the courts of another jurisdiction are bound to do so. The effect of the agreement was to provide for an increase of costs, which are only incidental to the judgment, and the allowance of which must necessarily depend upon the law of the forum. A stipulation in a note made in Utah Territory, providing that in an action on the note the plaintiff, in case of a recovery, should be entitled to double costs, might be considered valid under the laws of that Territory, and enforceable in its courts; but that certainly would not render it incumbent upon the courts of this State, in an action upon such note, to award double costs. The decree will be modified in reference to the personal judgment against the appellant, and in regard to the allowance of the 10 per cent as costs for collection of the note, in accordance with the principles of this opinion. In all other respects the decree appealed from will be affirmed.

LORD, J., thinks the attorney's fees in this case are reasonable.