## WILLIAMSON v. LIVERPOOL, L. & G. INS. CO.

(Circuit Court, W. D. Missouri, W. D.  November 26, 1900.)

### No. 2,495.

CONSTITUTIONAL LAW—EQUAL PROTECTION OF LAWS—STATUTE ALLOWING DAMAGES AND ATTORNEY'S FEES AGAINST INSURANCE COMPANIES.

Rev. St. Mo. 1899, § 8012, providing that "in any action against any insurance company to recover the amount of any loss under a policy," if it appear from the evidence that such company has vexatiously refused to pay such loss, the court or jury may allow the plaintiff damages, not exceeding 10 per cent. on the amount of the loss, and a reasonable attorney's fee, is in violation of the fourteenth constitutional amendment, as denying to insurance companies the equal protection of the laws by subjecting them to penalties which are not imposed on their adversaries or upon other litigants.  The business of insurance is not of such character as to render insurance contracts, or actions thereon, proper subjects for discriminative legislation, under the police powers of the state; nor is the fact that payment must have been "vexatiously refused," to subject the defendant to the penalty, material, since no corresponding penalty is incurred by the plaintiff in case the suit is vexatiously brought.

At Law.  On motion to strike out parts of the petition.

: L. C. Boyle, for plaintiff.
M. A. Fyke, for defendant.

PHILIPS, District Judge. This an action, containing several counts, to recover losses based on certain fire insurance policies issued by defendant to plaintiff. On the first count, in addition to the judgment asked for to cover the loss, plaintiff asks for 10 per cent. damages, amounting to $466.66⅔, and a reasonable attorney's fee of $600; on the second count, in addition to the loss sustained on the property, plaintiff prays judgment for 10 per cent. damages, amounting to $533.33⅓, and a reasonable attorney's fee of $700; on the third count, additional damages of 10 per cent. on the sum of the loss, amounting to $1,000, and a reasonable attorney's fee of $1,000; and on the fourth count, the sum of $2,000 as damages, and a reasonable attorney's fee of $2,300, are prayed for in addition to the amount of the loss. The defendant has filed a motion to strike out those parts of the petition praying judgment for said damages and attorney's fees, on the ground that the statute authorizing the same is unconstitutional and void, being in conflict with the provisions of both the state and federal constitutions.

The statute in question is found in section 8012, Rev. St. Mo. 1899, as follows:

"In any action against any insurance company to recover the amount of any loss under a policy of fire, life, marine or other insurance, if it appear from the evidence that such company has vexatiously refused to pay such loss, the court or jury may, in addition to the amount thereof and interest, allow the plaintiff damages not exceeding ten per cent. on the amount of the loss, and a reasonable attorney's fee; and the court shall enter judgment for the aggregate sum found in the verdict."

The supreme court in Railway Co. v. Ellis, 165 U. S. 150, 17 Sup. Ct. 255, 41 L. Ed. 666, held that an act of the legislature of Texas, which provides, in effect, that any person in that state having a valid bona fide claim for personal services or labor, or for damages, or for overcharges on freight, or claims for stock killed or injured by any railroad company, provided such claim for stock killed or injured shall be presented to the agent of the company near by, etc., and if, at the expiration of 30 days after such presentation, such claim has not been paid or satisfied, he may institute suit therefor, and, if he prevail, "he shall be entitled to recover the amount of such claim, and all costs of suit, and in addition thereto all reasonable attorney's fees, not to exceed $10, to be assessed and awarded by the court or jury trying the issue," is a violation of the fourteenth amendment of the federal constitution, as it deprives a railroad company of property without due process of law, and denies it the equal protection of the law, in that it singles out railroad companies among all its citizens, requiring them to pay, in certain cases, attorney's fees to the successful party suing them, while it gives to them no like corresponding benefit. The court said:

. "It is simply a statute imposing a penalty upon railroad corporations for a failure to pay certain debts. No individuals are thus punished, and no other corporations. The act singles out a certain class of debtors, and punishes them, when for like delinquencies it punishes no others. They are not treated

as other debtors, or equally with other debtors. They cannot appeal to the courts as other litigants under like conditions, and with like protection. If litigation terminates adversely to them, they are mulcted in the attorney's fee of the successful plaintiff; if it terminates in their favor, they recover no attorney's fee. It is no sufficient answer to say that they are punished only when adjudged to be in the wrong. They do not enter the courts upon equal terms. They must pay attorney's fees if wrong; they do not recover any if right; while their adversaries recover if right, and pay nothing if wrong. In the suits, therefore, to which they are parties they are discriminated against, and are not treated as others. They do not stand equal before the law. They do not receive its equal protection. All this is obvious from a mere inspection of the statute."

The supreme court of this state, in Paddock v. Railway Co. (just reported) 56 S. W. 453, has followed this decision, and held that the statute of the state of Missouri which permits an attorney's fee to be taxed in favor of the plaintiff, on recovering judgment against a railroad company for injury to stock resulting from the negligence of the company, is void, as in conflict with the constitution.

The supreme court of Colorado, in the recent case of Davidson v. Jennings, 60 Pac. 354, has applied the same ruling to a statute of that state providing for the taxation of attorney's fees in mechanics' lien foreclosure suits, which is not allowed in other like proceedings.

A like ruling has been made by the supreme court of Michigan in Wilder v. Railway Co., 70 Mich. 382, 38 N. W. 289, in which the court says:

"This inequality and injustice cannot be sustained upon any principle known to the law. It is repugnant to our form of government, and out of harmony with the genius of our free institutions. The legislature cannot give to one party in litigation such privileges as will arm him with special and important pecuniary advantages over his antagonist."

The supreme court of California, in the recent case of Johnson v. Mining Co., 59 Pac. 304, 47 L. R. A. 338, has declared an act of the legislature void and unconstitutional giving a lien for wages on all the property of the corporation in preference to all other liens, except duly recorded mortgages and deeds of trust, in case of failure of the corporation to pay its employés monthly, and an attorney's fee in case of an action to enforce the lien. The discussion of this and kindred statutes, in the latter case, is most elaborate and instructive. It asserts the doctrine, laid down in Wally's Heirs v. Kennedy, 2 Yerg. 554, 24 Am. Dec. 511, that:

"The rights of every individual must stand or fall by the same rule or law that governs every other member of the body politic. or land, under similar circumstances; and every partial or private law which directly proposes to destroy or affect individual rights, or does the same thing by affording remedies leading to similar consequences, is unconstitutional and void. Were it otherwise, odious individuals or corporations would be governed by one law, the mass of the community and those who made the law by another, whereas a like general law affecting the whole community equally could not have been passed."

And as quite germane to the Missouri statute under consideration, the court observed:

"It is said that corporations being the creatures of the state, and deriving their powers from their charters, the same power that created them may alter or amend their charters, or deprive them of rights originally given them. This is true as to certain purposes, but the legislature cannot, after creating

a corporation, and while it exists, deprive it of the rights guarantied to it by the federal constitution, nor deprive it of its right to resort to the courts of law, nor take its property without due process of law, nor subject it to unequal and oppressive burdens, nor deprive it of the equal protection of the laws. But the act in question applies, not only to the corporations existing under the laws of this state, but to all other corporations doing business in this state, and in no wise indebted to the state for their charters. Surely, the legislature of this state could not alter, amend, or repeal the charter of a corporation existing under the laws of another state."

Why these rulings are not applicable to the statute in question respecting insurance companies, which is applied to no other suitors except as to an attorney's fee in the instance referred to of suits against railroad companies, is not apparent upon principles of equal right in the courts of all litigants and all citizens. The learned counsel for plaintiff undertakes to differentiate the case of an insurance company from all the other legislative acts imposing like penalties, declared by the courts to be unconstitutional, on the ground that in modern commerce and trade insurance on life and property has become almost essential; that contracts between parties are largely dependent upon insurance; and, therefore, as the prompt payment of losses may be essential in the liquidation of these contractual liabilities, it touches the public policy of the state that the payment of losses should be coerced by this character of legislation. Under this idea, the legislature might undertake to declare that a citizen should not enter into certain classes of contracts, unless he holds a policy of insurance on his life or property, and giving the other party a lien on the policy as security. With much greater reason, it seems to me, if insurance has become so largely inseparable from commercial transactions as to be promotive of contracts by furnishing valuable credit and security, it should rather be a sound, rational policy of the state to burden and impede the issuance of such policies, with fewer discriminating penalties than other business or trading associations. The same specious arguments with which the astute counsel has pressed this consideration in respect of the discrimination against insurance companies would apply with equal, if not greater, force to suits against railroad companies. For what associations of capital are more indispensable to the prosperity and development of commerce and trade, in every industrial department, touching every hamlet and corner of the extended continent, than our railroads? And, getting back of these to the moving forces, we find that steam is indispensable to railroads for locomotion; and why not then declare by legislation that any association furnishing fuel for the railroads, failing to keep its contract, shall, in case of suit against it for a breach of contract, in addition to the damage caused the railroad, be liable to 10 per cent. and a reasonable attorney's fee? So of electricity. The movement of the street cars of our great metropolitan cities, and the lighting of business houses and the homes of the people, in our modern civilization, have rendered plants generating electricity quite indispensable. Why not, therefore, carry the idea to the reductio ad absurdum, and say that, as the running of railroad trains is dependent upon the fidelity of the conductor in charge, the engineer at the throttle, and

the fireman at the shovel, and the miner, who, with his powder and pick, digs the coal, is indispensable to the creation of steam which gives motion to the cars, and the engineer who runs the dynamo-electric machine furnishing the electricity that propels the street cars and lights this public building, the business houses, and our homes, if any one of these should break his contract the employé, in addition to the recovery of consequential damages, shall be liable, in case of suit against him, to 10 per cent. additional and a reasonable attorney's fee? The allotted work of the constituent elements and actors, producing the result of accomplishing the object of the association, is as much allied to the public policy and police power of the state as the composite association. And the statute that should undertake to subject either of these classes of material men or laborers to such penalties, in contradistinction to other classes of material men and laborers, would certainly be pronounced bad, as flying in the very teeth both of the letter and spirit of the state and federal constitutions.

Turning this argument over, presenting, in effect, a like side, in a supplemental brief, counsel for plaintiff argues that every fire policy of insurance is clothed with a public interest, and affects the public welfare, and therefore it comes within the police power of the state to impose penalties for failure of the company to make prompt liquidation. This proposition is enforced by the illustration of the burning of the Kansas City Convention Hall, in which it is assumed that the only valid defense the insurance companies could have interposed would have been an act of incendiarism. And it is suggested that, if the insurance companies had delayed payment without reasonable excuse, the effect would have been injurious to the whole community, as it could not have rebuilt the hall in time to have entertained the Democratic National Convention. Without stopping to discuss the exact relation of that convention to the public welfare, let us carry to its logical conclusion this illustration of the doctrine advanced. If the contractors had failed to keep and perform their contracts, and the material men had failed to deliver timely the ironwork and bricks, the building would not have been completed in time to accommodate the convention. Would that failure clothe such contracts with such public character as to involve the public welfare, and bring their regulation within the police power of the state? The popular conception touching such transactions has been that they are essentially subjects-matter of private contract, and the only penalties assessable for such defaults are such as are prescribed by the specifications of the contract. A railroad company has a contract with a contractor to build and deliver to it a given number of passenger and freight cars at a certain time and place. His failure to comply might occasion great loss to the road, as well as to shippers and travelers who expect to utilize this equipment. Would this breach of contract present a public question, in the sense that it comes within the police power of the state, independent of the terms of the contract, to regulate by the imposition of penalties under the guise of an exercise of the police power?

Having started upon this line of argument, counsel did not hesi-

tate to accept its logical results, by applying it to the situation of his client, whose house being centrally located in this city, he claims that the public has an interest in its speedy re-erection, so that, if he is unable to rebuild until the defendant company liquidates his loss, the delay concerns the public, and therefore the public welfare is involved, and such delinquency would fall under the police power of the state to punish. This argument would apply with equal reason and force to a private contract between A. and B. In a sense, the public welfare is concerned in every head of a family having a home; as the home is the nursery of the family, and the family is the nursery of the state. Therefore, if B. owes A. $5,000, with which A. expects to build a dwelling house in a desirable part of the city, would the default of B. so involve the public welfare as to bring such contract within the police power of the state? While there is a disposition in the judicial mind to stretch to tension the inherent police power of the state to conserve the public weal, and this power is constantly extended in its application to meet the exigencies of new conditions presented by the complexities of a widening civilization, yet, like every other power, it has its boundaries defined by judicial construction, following approximately defined rules. Like judicial discretion, there is more danger in giving it unbridled play than in hedging it about with fixed, impassable barriers.

The central definition of the police power of the state in general is "a system of precaution, either for the prevention of crimes or of calamities," and police regulations "are such provisions of the law as are designed to protect the lives, limbs, health, comfort, and quiet of citizens, and to secure them in the enjoyment of their property. And the police power can be invoked for an interference with one's dominion over his own property to prevent such use of it by him, or its continuance in such condition, as would be detrimental to the community, and on no other grounds." State v. Greer, 78 Mo. 188–195. As said by Judge Cooley: "Police regulations must have some reference to the comfort, safety, and welfare of society." They can never conflict with the constitutional rights of the citizen. How can it be said that an act of the legislature imposing a penalty on insurance companies for resisting or delaying the payment of an insurance loss touches the public policy of the state or pertains to its police power to regulate it? The business of insurance is not immoral. It spreads no contagious disease. It does not affect the public health. It does not obstruct the public policy of the state, nor threaten the community with any public calamity or danger. On the contrary, the argument of plaintiff's counsel is that the business of insurance has become inwoven with the very life of trade, promoting, rather than endangering, the public welfare, as much so as the existence and business of railroad and telegraph companies.

The case relied upon, principally, by plaintiff's counsel in support of this contention, is that of Railroad Co. v. Matthews, 174 U. S. 96, 19 Sup. Ct. 609, 43 L. Ed. 909, which has carried the doctrine of the police power of the state, I take it, to its ultimate limit. In this case the court held to be valid an act of the legislature of the state of Kansas entitled "An act relating to the liability of railroad com-

panies for damages by fire," which provided that, in all actions commenced under this act, if the plaintiff shall recover there shall be allowed him by the court a reasonable attorney's fee, which shall become a part of the judgment. This ruling was bottomed on the distinct proposition "that there is a peculiar danger of fire from the running of railroad trains. The locomotives, passing, as they do, at great rates of speed, and often when the wind is blowing a gale, will, unless the utmost care is taken, and sometimes in spite of such care, scatter fire along the track. The danger to adjacent property is one which is especially felt in a prairie state like Kansas.   *   *   *   Fire, catching in the dry grass runs for miles, destroying not merely crops, but houses and barns." And because of the widespread and far-reaching disaster to whole communities, integral parts of the state, incident to the escape of fire, endangering life and property, the public welfare was held to be directly involved in such calamity, and brought the instance within the police power of the state to regulate, as a preventive and protective remedy. The vigorous dissent of four out of nine justices gives assurance that the distinction almost metaphysically drawn by Mr. Justice Brewer between that ruling and the principles enunciated in the Ellis Case is not to be still further advanced. Indeed, as if apprehensive that the exceptional distinguishing features of the Matthews Case—the communicating of fire to farms when "caused by the operating" of the road —might be misunderstood and misapplied, he took the precaution, before closing the opinion, to observe that, while the courts should give considerate attention to the declared legislative policy of the state, "it is also true that the equal protection guarantied by the constitution forbids the legislature to select a person, natural or artificial, and impose upon him or it burdens and liabilities which are not cast upon others similarly situated. It cannot pick out one individual or one corporation, and enact that, whenever he or it is sued, judgment shall be for double damages, or subject to an attorney's fee in favor of the plaintiff, when no other individual or corporation is subjected to the same rule. Neither can it make a classification of individuals or corporations which is purely arbitrary, and impose upon such class special burdens and liabilities. Even where the selection is not obviously unreasonable and arbitrary, if the discrimination is based upon matters which have no relation to the object sought to be accomplished, the same conclusion of unconstitutionality is affirmed." Soon after the decision in the Matthews Case, the courts of Kansas seized upon it to uphold such discriminating statute as the one under consideration here. This decision, and the one cited from Association v. Yoakum, 39 C. C. A. 56, 98 Fed. 251, do not commend themselves to my judgment.

The very terms of the Missouri statute under discussion show that its purpose was, not to protect the community from calamity by preventing the destruction of property by any recognized dangerous methods of operation, but its sole purpose is to coerce the payment of a private debt by deterring insurance companies from taking any chances of litigation, even though the defendant may honestly believe it has a meritorious defense. The penalty is imposed for refusing "to pay such loss."

The final contention of plaintiff is that this penalty is imposed only when the company "vexatiously" refuses to pay such loss. "Vexatious" is a vague term. In practice under this statute, it is little more than an epithet. The supreme court of this state holds that no direct proof of its existence is exacted of the plaintiff. Lockwood v. Insurance Co., 47 Mo. 50. It is to be left to the jury to determine from the general facts and incidents of the case. "Vexation" may mean, within a mere dictionary definition, trouble or annoying inconvenience to which the party is put in going to law. The defendant may honestly rely upon what it is advised by counsel to be a correct construction of some provision of the contract, or upon some hitherto undetermined proposition of law, or upon a belief in the existence of some fact susceptible of proof which ought to defeat a recovery. After the court has resolved the question of law in favor of the plaintiff, or after the defendant's witnesses to a controverted fact have been overborne by the weight of the plaintiff's evidence, the jury, occupying the vantage ground, may think the proposition of law was so plain, and the evidence for the plaintiff so strong, it could conclude that the defense was meritless, and therefore vexatious. The trial judge, conceiving that there was some atom or scintilla of evidence to support the jury's inference, would decline to interfere. And, in view of the known inclination of juries in such trials, the result, in general, would practically be the same as if this qualifying phrase were eliminated from the statute. Section 1107 of the Missouri Statutes, taxing a reasonable attorney's fee in suits against railroad companies, declared to be unconstitutional by the supreme court in the Paddock Case, supra, authorizes the imposition of this penalty only where the owner of stock killed "should be compelled to bring suit in court to recover the damages so sustained," and then only where the company had neglected to fence as required by the preceding section of the statute. The court attached no importance to the conduct of the company in refusing to pay and compelling suit. It is, however, a complete answer to this suggestion that this statute is leveled solely at insurance companies. If the assured has wantonly burned his own house, and the company refuses to pay, whereupon suit is brought against it, notwithstanding the defendant should clearly prove the act of incendiarism, and show that the suit was wholly vexatious, no damage or attorney's fee is taxable in its favor. If A. owes B. $1,000, evidenced by a note, to which he has not the shadow of a defense, and compels B. to hire a lawyer to enforce payment by suit, although A. defends solely to harass and delay his creditor, there is no statute of the state imposing upon such delinquent a like penalty. The Code of Practice of the state (section 867) provides that:

"Upon the affirmance of any judgment or decision, or upon the dismissal of any case, the supreme court may award to the appellee or defendant in error, such damages, not exceeding ten per cent. on the amount of the judgment complained of, as may seem just."

It is observable that this punitive provision applies to all suitors, plaintiffs and defendants, natural persons as well as artificial concerns, alike. Had the legislature, however, declared that upon the

affirmance of any judgment, etc., against an insurance company, the supreme court may award against it damages, not exceeding 10 per cent. on the amount of the judgment complained of, as may seem just, with no like provision as to any other appellant or plaintiff in error, the statute would certainly fall under the inhibition of both the bill of rights of the state and the fourteenth amendment to the federal constitution.   The motion is sustained.