KLINE BROS. & CO. v. ROYAL INS. CO., Limited.

(Circuit Court, S. D. New York.   July 10, 1911.   On Rehearing, December 1, 1911.)

1. CORPORATIONS (§ 448*)—VALIDITY OF CONTRACT—INSURANCE POLICY ISSUED TO PROJECTED CORPORATION—RATIFICATION.

   Insurance policies issued in the name of a projected corporation which had not at the time been legally organized covering property which on its organization passed into its ownership, while not effective when issued, became so when after its organization it ratified the action of the individual incorporator, who procured the insurance by accepting and retaining the policies, and repaying him the amount paid for premiums.

   [Ed. Note.—For other cases, see Corporations, Dec. Dig. § 448.*]

2. INSURANCE (§§ 283, 330*)—AVOIDANCE OF POLICY FOR BREACH OF CONDITION—INCUMBRANCE.

   A corporation was formed by tobacco growers to conduct a warehouse for the storage, packing, and sale of tobacco delivered to it by the incor-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

porators. Defendants issued policies of insurance to the corporation, insuring it "on leaf tobacco  *  *  *  their own or held by them in trust or on commission or sold but not delivered, while contained in the  *  *  *  building  *  *  *  occupied as a tobacco ware and packing house." One of the incorporators had purchased the tobacco of another grower, which he afterward delivered to the company's warehouse. Subsequently, after some of the policies were issued and before the issuance of others, he executed a chattel mortgage on such tobacco to the seller to secure a part of the purchase price. The policies contained the usual clause making them void if the property was or should be incumbered by the insured or with his consent. *Held*, that whether the corporation became the owner of the tobacco delivered to it, or held the same as factor or other bailee for the growers, as to which there was some question, the validity of the policies was not affected by such mortgage to which it was not a party, and did not consent.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. §§ 283, 330.*]

3. INSURANCE (§ 335*)—CONSTRUCTION OF POLICY—COVENANT FOR "INVENTORY."

A covenant in a policy issued to a corporation conducting a tobacco warehouse covering the tobacco therein, which required the insured to keep "a complete itemized inventory of stock on hand, showing grades and brands," did not require such inventory to contain a statement of values which were readily ascertainable from the statement of grades or brands.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 853; Dec. Dig. § 335.*

For other definitions, see Words and Phrases, vol. 4, pp. 3754, 3755.]

4. INSURANCE (§ 646*)—ACTION ON POLICY—DEFENSES—BREACH OF COVENANT—BURDEN OF PROOF.

Breach of a covenant in a policy that insured will keep its books in an iron safe is a defense in an action on the policy, and must be proved by defendant.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1655; Dec. Dig. § 646.*]

5. CORPORATIONS (§ 406*)—POWERS OF OFFICERS—PRESIDENT.

The president of a corporation has no authority as such to make a contract for insurance in its behalf in the absence of some incidental powers, express or implied, and such authority is directly negatived by a by-law providing that "all contracts or obligations of any kind which may be entered into shall be made by the board of directors."

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 406.*]

6. INSURANCE (§ 142*)—VALIDITY OF CONTRACT—CONTRACT WITH UNAUTHORIZED AGENT—RATIFICATION AFTER LOSS.

A contract for insurance made by an unauthorized agent on behalf of his principal on which the premium has not been paid is not binding on the insurer before the principal has ratified, nor can it be bound by a ratification or a tender of the premium by the agent after the occurrence of a fire which has destroyed the subject of insurance, and which fact is known to both parties.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 142.*]

7. INSURANCE (§ 675*)—ACTION ON POLICY—ATTORNEY'S FEE—STATE STATUTE.

A state statute providing for the allowance of an attorney's fee to a plaintiff on recovery in an action on an insurance policy relates solely to a matter of procedure, and does not govern in an action in another state.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1805, 1806; Dec. Dig. § 675.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

8. CORPORATIONS (§ 295*)—OFFICERS—TENURE—ELECTION AND INDUCTION OF SUCCESSOR.

The president of a corporation whose successor was legally elected obtained the keys and peaceably took possession of the building and office of the company containing its books and records ceased from that time to have any authority whatever to represent the corporation as its president, and did not regain it by forcibly ejecting the lawful president and retaking possession of the office and property.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1206; Dec. Dig. § 295.*]

At Law. Actions by Kline Bros. & Co. against the Royal Insurance Company, Limited, against the London & Lancashire Fire Insurance Company, against the Liverpool & London & Globe Insurance Company, Limited, and against the Insurance Company of North America. On motions for directed verdict. Verdict for plaintiff in the first two cases, and for defendants in the last two.

See, also, 184 Fed. 969.

Fried & Czaki, for plaintiff.

T. A. Hammond, Herbert D. Mason, and Randolph W. Childs, for Liverpool & London & Globe Ins. Co., Ltd., and Insurance Co. of North America.

Hartwell Cabell, for London & Lancashire Fire Ins. Co.

Cardozo & Nathan, for Royal Ins. Co., Ltd.

HAND, District Judge. These are four actions upon fire insurance policies issued by four different companies. Various defenses are interposed by the defendant companies, of which not all apply to every defense. The most convenient way will be to take up the defenses as such, noting in each case those defendants to which each defense applies.

First Defense. *That the policies were issued before the organization of the plaintiff.*

[1] The policy to the Royal Insurance Company was issued on July 22, 1908. The organization papers of the plaintiff were filed in the Secretary of State's office at Tallahassee on July 30th, and on the 31st of August letters patent were issued by the Governor and Secretary of State. Therefore the legal existence of the corporation dates from the 31st day of August, 1908. I have not been able to appreciate the force of the defendant's suggestion that the date of the first meeting of the directors December 16, 1908, had any materiality. Much has been said about the de facto existence of this corporation, but that doctrine can play no part here. There are no cases, so far as I know, in which it is held that the incorporators' mistake as to the time when the corporate existence begins will supply for the time being any of those formalities, upon which alone the state creates the legal entity. The judge below seems to have so thought in Whitney v. Wyman, 101 U. S. 392, 25 L. Ed. 1050, but it was not on appeal so treated. In the case at bar, however, it affirmatively appears that both Kline and Love knew that there was no corporation in existence on July 22, 1908, so that the point cannot

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

arise as to the Royal policy. As to the London & Lancashire Insurance Company, it does not appear whether they supposed the filing of papers on July 30th effected an incorporation, nor is it in the least material whether or not they did. The doctrine of de facto corporations only helps out a corporation in whose organization there has been some defect after the incorporators have bona fide completed all the steps that they meant to take. It implies that they have in good faith completed the organization so far as they understand the statutory requirements, but that their understanding of those requirements is defective. In the case at bar whoever had charge of the organization of the corporation understood perfectly well what were the requirements of the law and completely fulfilled them so that the corporation when it was organized was regular to the letter. Kline, who was one of its agents, if he did suppose it to have been organized on July 30, 1908, simply made a mistake of the law, but that personal mistake of his did not create the corporation any sooner than it would otherwise have come into being. The case must, therefore, be determined upon the theory that at the time when each policy was made there was no corporation. Now I agree that the person insured was the corporation, and not the associates. Kline so swears in his version of the talk between himself and Love, and Love is not produced, nor is any reason given for his silence. That testimony is competent evidence to show what the parties meant by the words "Kline Bros. Co." or "Kline Bros. & Co." which they used in the policies. Besides, it was quite natural that Kline should think the corporation would be soon organized, and that it was more convenient to take out the policies in the name of the corporation. Perhaps Kline thought that by August 19th the corporation was already formed, in which case it would have been the proper person to insure.

The defendants' answer to this is that it was inconsistent with an intention to insure the corporation not yet formed, at the same time to intend to insure the goods immediately, as Kline very frankly says that he intends to do. This argument, however, confuses intention with purpose, once we assume, as we must, that they expressed the intention of insuring the corporation. If with that specific intent they erroneously thought that the policy would cover the goods at once, it was only a mistake of theirs as to the legal consequences of their acts, which does not change the actual consequences that the law will attribute to them. If they agreed to insure the corporation and only the corporation, the only insurance they effected was of the corporation, whether or not they expected that such an insurance would do more than in law it actually would.

What, then, was the effect of issuing two policies insuring the corporation before it existed? If the corporation subsequently ratified the agreement, it became theirs as much as though originally authorized while the corporation was in existence. Stanley v. Chester & Berkenhead Ry. Co., 9 Simon, 264; 3 Myl. & Cr. 773; Whitney v. Wyman, 101 U. S. 392, 25 L. Ed. 1050; Rogers v. N. Y. & T. L. Co., 134 N. Y. 197, 32 N. E. 27; Seymour v. G. F. C. Ass'n, 144 N. Y. 333, 39 N. E. 365, 26 L. R. A. 859. In the case at bar the

corporation certainly ratified the contract on December 16, 1908, when Kline's accounts were passed. Moreover, even if, as president and manager of the company, Kline could not virtute officii take out insurance, the corporation ratified the policies by inaction after the corporation was formed, for they were in the corporation's possession. It is of no consequence, however, to determine when the ratification occurred at the earliest, for it certainly occurred before any fire.

Second Defense. *The mortgage by Kline to Littmann.*

[2] This defense is urged by all the defendants. On June 15, 1908, Littmann, who was one of the original growers under the contract of April 15, 1908, made a contract for the sale of all his tobacco to Kline, at which time the tobacco had not been delivered at the warehouse. Any rights which Kline got by virtue of the agreement were subject to the prior agreement of April 15, 1908, to which both were parties, and any rights which Littmann got by the chattel mortgage of Kline on February 9, 1909, to secure a part of the purchase price, were similarly subject to the same conditions. The contract of April 15, 1908, has been the occasion of some discussion at the bar, and there are two possible interpretations which will fit it, between which, for the purposes of this cause, I do not think that it is necessary to decide. The first is that the corporation upon delivery got title to all tobacco sent to the warehouse by any of the adventurers, and that the latter retained at most only such interest in it as was necessary to protect them for the payment of the purchase price of 60 cents a pound. The other is that the corporation remained, as it were, the factor, or agent of some less definite kind, not vested with title, but authorized to sort, cure and pack the tobacco, to sell it, and to collect and distribute the proceeds as indicated by the agreement of April 15, 1908. In the first case the corporation insured its own tobacco when it did insure; in the second case, it insured the adventurers' tobacco which it held in a more or less anomalous agency and under some sort of bailment.

These being the possible relations of the parties, what effect, if any, upon the insurance had Kline's mortgage back to Littmann on February 9, 1909, which was to secure a part of the purchase price of 60 cents between them? All the policies are taken out in this form:

"Does insure Messrs. Kline Bros. Co. (or Kline Bros. & Co.) * * * to an amount not exceeding * * * to the following described property * * * on leaf tobacco * * * their own or held by them in trust or on commission or sold but not delivered, while contained in the * * * building * * * occupied as a tobacco ware and packing house."

This form of policy has received construction several times by the courts, and is that especially adapted to the purposes of factors and commission merchants who frequently wish to cover a more or less fluctuating stock of merchandise in which they may have every sort of ownership. It was an apt description of the relations in this case between the corporation and the growers, whether the title was in the corporation, held in trust to the extent of the growers' lien upon it, or was in the growers, the corporation being only a factor to sort, pack, and sell the goods. Was the subject of insurance incumbered

by a chattel mortgage? If the title was in the corporation, this could not be so, for Kline had power to mortgage only what he had title to, and he had no interest upon that assumption except an interest in the proceeds to the extent of the purchase price and perhaps a corresponding equitable interest in the res prior to sale. If, on the other hand, the title remained in the growers, then Kline's mortgage did incumber the property. Did that incumbrance fall within the terms of the covenant? The covenant means that the subject of insurance must be incumbered by the insured or with his consent. Hosford v. Hartford Ins. Co., 127 U. S. 404, 8 Sup. Ct. 1202, 32 L. Ed. 198. Assuming the title to have been still in Kline, still the corporation was the insured and the corporation did not make the incumbrance, nor did it consent to the incumbrance. There has been much talk of whether Kline's connection at the time with the corporation, he, although no longer president, being a director and vice president, was a notice to the corporation. That is of no consequence because notice is one thing and consent is another, and inaction after notice cannot become consent unless under circumstances which call for action. Here there was absolutely no call for action by the corporation, if it did have notice of the mortgage. Whether or not the title was in the corporation, it had no interest in conveyances or mortgages by one of the growers to a third person. The meaning of the rule in Hosford v. Hartford Insurance Company, supra, is that the objectionable conveyance must be such as requires some affirmative act of the assured, for in that case the lien arose from the assured's inaction; i. e., his failure to pay those taxes. The question of notice is therefore irrelevant.

Nor is this merely a formal way to treat the defendants' rights. Such policies are necessarily ambulatory, and are so intended. Thus in Waring v. Indemnity F. I. Co., 45 N. Y. 606, 6 Am. Rep. 146, the words, "sold but not removed," were held to cover goods sold after the policy took effect. The same thing has been held as to the words, "For whom it may concern," which are kindred to the words in this policy. Hagan v. Scottish Ins. Co., 186 U. S. 423, 22 Sup. Ct. 862, 46 L. Ed. 1229. Indeed, it has been said, though quite obiter, that the phrases are equivalent, per Oakley, J., in De Forest v. Fulton Fire Ins. Co., 1 Hall (N. Y.) 136, and per Fullerton, J., in Lee v. Adsit, 37 N. Y. 90. It therefore makes no difference whether the mortgage was already on the property before the policy was issued or was put on afterwards, and, if those policies are not void in which there was an incumbrance on the property when the policy was issued, neither will the earlier policies be void, although the mortgage was made after they were issued. As to all these policies, the theory is that to permit changes in ownership or by incumbrance will increase the moral hazard. Under these circumstances, there is no room for such a consideration because moral hazards presuppose some right of personal selection, and the very form of the policy precludes selection, beyond the insured. The insured is the factor, or commission merchant, who by the express words of the parties is insured, not only for himself, but for all sorts of other people in various relations and all wholly

unknown to the insurer. When the contract thus precludes any per-
sonal relation except in the case of the factor, one cannot speak of
an increase in moral hazard resulting from some change in the owner-
ship among the unknown beneficiaries. The only selection which the
insurer asks, is of the factor whose customers he insures. It may well
be that selection will protect him somewhat, since a man is somewhat
known by the business company he keeps, but, whether it does or not,
that is all he has asked for, and all he should get. There is then no
substantial merit whatever in the defendants' contention. I have al-
ready shown that under Hosford v. Hartford Ins. Co., supra, it has
no formal validity as mere matter of verbal construction, and the
necessary result is that the defense fails.

Third Defense. *The iron-safe clause.*

This defense applies to only the first two policies, because the last
two had not been in existence 30 days, and the warranty is a covenant,
and not a representation. The clause in question is in three parts:
First, the agreement to keep an inventory; second, to keep books of
sale and shipment; third, to keep the books in a safe.

[3] The inventory is described in these words: "A complete itemized
inventory of stock on hand, showing grades and brands." In compli-
ance with this, the assured kept two books showing the number of
each bale with the size of the leaf, the kind and the packing. The
weight was known because bales of a given packing were made sub-
stantially of one size and weight. These books, it is true, only cov-
ered the baled tobacco, but a double list was kept of the raw tobacco
as it was received. Not only was it entered in a book showing the
weight, the date and the grower, but the same facts were also entered
upon the leaves of another book by carbon impression from the orig-
inal receipts given to the growers. Now the tobacco when received
was unsorted and when baled was of substantially uniform weight.
As a result the insured had an unusually complete record in the form
of permanent books of all the details which it was necessary to have
to conform to the purposes of the warranty, except the detail of the
price or value. Whether the word "inventory" includes a statement
of the value of the goods is not wholly certain, although the author-
itative English dictionary, Murray's Oxford, gives that element as
optional in the definition.[1] However that may be, here the context
of the word shows that value was not required, for the requirement
that brands and grades shall be stated implies as much. "Expressio
unius," etc. More especially is this the case in staple and uniform
articles like tobacco which are sold, not as individual pieces, but by
the pound of the kind and grade specified. It is not to be supposed
that the value, at most a mere calculation from market values, would
be required as in the case of an assorted stock of merchandise, where
the difficulty of assessing a value upon each was very great. This
is no case like Southern Fire Ins. Co. v. Knight, 111 Ga. 622, 36 S.
E. 821, 52 L. R. A. 70, 78 Am. St. Rep. 216, where the insured is
trying to piece together loose invoice sheets into an inventory. It is

---

[1] A list; catalogue; a detailed account. Murray's Oxford Dict. vol. 5,
p. 453.

true that there are some remarks there regarding value, but the clause in that case did not contain the limitation as to grades and brands, whose inclusion here becomes more significant thereby, and, even if that distinction be not good, the words relied on in that case were clearly obiter. While the tobacco was loose and ungraded, they had a complete record of it as such. When it was graded and baled, they had a record of it as well. I must say I cannot see what more the insured could in reason be asked to do.

The next requirement was that the assured will keep a set of books presenting a complete record of business transacted, including all purchases, sales, and shipments. Such books were kept, but it is said that they were Kline's private books, an entirely groundless assertion, in view of Kline's possession of them only while president and his delivery of them to the company shortly after December 16, 1908, in pursuance of a resolution calling for the corporate books.

[4] As to the iron safe, the assured kept one, and it has not been proved by the defendant that Schwartz's book was not put in the safe on the night in question. The breach of this warranty is a defense, and must be proved. The defendants have not discharged their burden in this regard.

Fourth Defense. *McIntosh's misrepresentations and his lack of authority.*

The answer before Judge Coxe correctly alleged the pendency of the mandamus proceedings, and relied upon the existence of the controversy as a dispute whether McIntosh was in fact president or not. The necessary result of that judgment was to hold that the suppression of the mandamus proceedings and of the controversy was not a defense. The amended answers replead this matter with a wholly unnecessary multiplication of detail, more like an equity pleading than one at law, and now insist that the defense is new. The matters alleged to have been suppressed are "the internal dissensions" within the company, "the charges of fraud" against Kline, and "the pendency of the mandamus proceedings." The internal dissensions and the pendency of the mandamus proceedings were both formerly set out as a defense, especially in the fourth defense of the original answer. The ruling upon them is binding upon me here. As matter of law, certainly the charges of fraud against Kline offer no different question from the internal dissensions of the stockholders, as evidenced by the mandamus proceedings. The substance of the defense in either case remains the same; i. e., that the stockholders were quarreling among themselves, and were in active legal controversy about the presidency of the company with its accompanying control. That issue was raised and decided upon the original answer, and I will therefore decline to consider it upon the merits now.

[5] The question of McIntosh's authority to contract as it involves the actual assent of the plaintiff to the policy is, however, somewhat different. That is an issue raised by the traverses, and must be considered, for it is not a defense at all. As president, he certainly had no power to bind the corporation, in the absence of some incidental powers, express or implied, of which there is no evidence. Wait

v. Nashua Armory Ass'n, 66 N. H. 581, 23 Atl. 77, 14 L. R. A. 356, 49 Am. St. Rep. 630; Lyndon Mill Co. v. Lyndon Institution, 63 Vt. 581, 22 Atl. 575, 25 Am. St. Rep. 783; Groeltz v. Armstrong Real Estate Co., 115 Iowa, 602, 89 N. W. 21; 2 Thompson on Corporations, § 1458. In this case there was no express authority which enlarged the president's authority beyond that implied virtute officii. The by-laws (article 4) provide, "the business and property of the company shall be managed by a board of three directors;" again:

"All purchases and sales of any kind by the company and all contracts or obligations of any kind which may be entered into shall be made by the board of directors, who, acting jointly, shall have the entire control and management of the affairs of the company, the receipt and disposal of its assets, and the payment of its obligations, and the incurring of any liabilities for the company."

In view of this, article 5 does not give the president any power to contract when it says:

"The president shall preside at all meetings and have supervision of the affairs of the company under the direction of the board of directors."

So much for authority virtute officii, or by express delegation. As to authority by the implied consent of the corporation arising by prior exercise, there is some evidence of such up to December 16, 1908, when Kline was doing everything which had to be done. On that day the by-laws were adopted, and there is no evidence that thereafter the president exercised any power but those prescribed in the by-laws. Kline's testimony is, moreover, directly to the contrary.

[6] Thus there seems to be no escape from the conclusion that by his contract with the defendants McIntosh did not bind the corporation to pay the premium. Furthermore, the board of directors never learned of the policies until after the fire, and did not therefore ratify them up to that time. At least, there is no evidence upon that question, and the burden rests with the plaintiff. As I view it, no subsequent ratification was possible. After the fire McIntosh tendered the premium, and after that the defendants repudiated any liability.

The facts, therefore, raise two questions: First, whether a third party who has made a contract with an unauthorized agent on behalf of his principal is bound before the principal has ratified; and second, if not, whether the occurrence of a fire before the unauthorized application for the policy has been ratified prevents its future ratification so as to bind the company. Upon the first question, there is no doubt some division of authority. In England the law now is that the third party may not withdraw, provided the principal ratifies the contract in season. Bolton Partners v. Lambert, 41 Ch. D. 295; Re Tiedemann (1899) 2 Q. B. D. 66. I do not regard Hagedorn v. Oliverson, 2 M. & S. 485, as authoritative, because the policy was there taken out for whom it might concern and the premium had been paid before capture. So, also, in Lucena v. Crawford, 1 Taunt. 325, and Routh v. Thompson, 13 East, 274, the premium appears to have been paid, though the facts are not quite clear. The case at bar is not, however, one in which the premium had been paid and accepted, and it is governed by quite different considerations, because in such cases

the insured has received the consideration, and cannot be compelled to return it whether or not the principal ratifies. On the other hand, in Wisconsin (Dodge v. Hopkins, 14 Wis. 630; Atlee v. Bartholomew et al., 69 Wis. 43, 33 N. W. 110, 5 Am. St. Rep. 103), and apparently in Illinois (Cowan v. Curran, 216 Ill. 598, 75 N. E. 322), the whole unauthorized contract seems to amount only to an offer by the third person, which must be accepted de novo by the principal, a rule certainly at variance with the well-established law that an uncommunicated ratification by the principal will bind him. The English case proceeds on the civil law maxim, "Omnis ratihabitio retrotrahitur," though it by no means follows, because a ratification relates back when once a valid contract is made, that the third party is bound meanwhile, and may not withdraw while the principal remains unbound. Now, relation back is in the sense here used a fiction, and certainly should not be extended to cover unjust cases, of which this is one, as I shall show. In so far as by the maxim it is only meant to say that a ratification carries with it by implication the intention of the principal that the contract shall in fact date from the time when it was made between the agent and the third party, it is unobjectionable in principle, and accords with the facts; but, if taken in the sense that the law will regard both parties as bound from the date of the contract, it merely misstates the facts, because, by hypothesis, the principal is not bound before ratification. All that the law can do is to hold the third party bound from the outset, and that by the mere force of authority. It certainly serves no useful purpose to cloak that authority in a phrase which misstates the truth in Latin, unless it accords with the principles of the law of contracts, or at least produces just results at the expense of those principles.

Upon principle the doctrine does not appear to be correct, and it has been criticised by text-writers. Wambaugh, 9 Harv. L. R. 60; 31 Cyc. 1291. The contract of insurance is bilateral, and, until the principal ratifies, he is by hypothesis under no obligation to pay the premium. If so, there is until then no consideration to support the counter promise of the third person, for a consideration implies a legal obligation, and his promise ought not in principle to bind him, being indeed nudum pactum. Second. The result is unfair to the third party, since it permits the principal to speculate on the value of the contract, while he himself remains unbound. If it proves advantageous, he may ratify. If not, he may repudiate. There is no just ground for giving him such an advantage over the third party merely because of an unknown defect in the agent's powers. In view of the dearth of authority in this country and especially of any decisions binding upon me, I do not think that I should follow the rule in Bolton v. Lambert, supra, but rather what I cannot but believe to be the result necessary under the principles of the laws of contract.

The question should be clearly distinguished from those cases in which a factor or other agent takes out a policy, like those in suit, for goods held on commission or in trust, and in which the principals may come in later and assume the benefit. In such cases the agent binds himself to pay the premium, and a valid bilateral contract at

once results. He is in such case acting in fact as a trustee for his principals, and they may come in and assume the valid chose in action so created, either before or after the loss. This is the meaning I think of the cases cited by the plaintiff, as it is of Hagedorn v. Oliverson, Lucena v. Crawford, supra, and Routh v. Thompson supra. In the case at bar McIntosh certainly did not intend to bind himself, and he had no authority to bind the company. Therefore, the insurer got no valid promise at all. Nor should this case be confused with those in which a ratification is used against the principal when he is sued. These two situations exhaust all the plaintiffs' citations.

The next question is whether, if the contract was not binding upon either party until McIntosh tendered the premium, the occurrence of the fire terminated that possibility. I may assume under Hagedorn v. Oliverson, supra, Routh v. Thompson, supra, and Lucena v. Crawford, supra, that the tender was sufficient, even though there is no evidence that even at that time McIntosh had been authorized to make it by the other two directors. If, however, the fire, which was known to both the insured and the insurer, terminated the possibility of binding the bargain by either ratification or tender, it was a nullity. An insurer's undertaking is a promise to pay upon a given event which either must happen in futuro, or if it have already happened must be still unknown. Were it not so, the promise would be merely to pay a large sum of money in consideration of a small one, which is an absurd intention to ascribe to any one. In the case at bar, since the loss had happened before the policy became binding, the promise could only be to pay for an existing loss. Such promises are common enough in marine insurance when the policy reads, "lost or not lost," and they have been held to be binding in the case of fire insurance when the policy was antedated and the loss occurred between the date and delivery of the policy. Commercial Ins. Co. v. Hallock, 27 N. J. Law, 645, 72 Am. Dec. 379. In all such cases, however, the policy at its inception must be construed as an insurance of a risk, not as a certain agreement to pay, for otherwise, as I have said, the contract becomes absurd. Thus in a marine policy, though the loss may have in fact occurred, the fact is unknown, and there is the same aleatory element in the promise, as though it might occur in the future. When that element disappears, the character of the contract goes with it, so that it may be said with accuracy that the element of some chance is a condition to the promise of the insurer, and, if that element does not exist, his promise is made under a mistake of existing fact. It is of no consequence whether that fact be the actual loss, in a case where the insurance is of future loss, or of the insured's knowledge of the loss, in a case where the insurance is of an existing loss. In either case there must be some uncertainty as to the loss, or else the presupposition upon which the promise is made does not exist.

In the case of Com. Ins. Co. v. Hallock, supra, the loss occurred only two hours before the policy took effect (see the report of cause in 26 N. J. Law, 271), and it did not appear when the insured learnt of it. Certainly the insured had no opportunity to withdraw the application before it was accepted. The court held that the antedating

of the policy made it equivalent to an insurance, "lost or not lost," and noted that there was no question raised of either fraud or concealment. If, however, the insured had known of the loss before making application, the contract would, of course, be fraudulent. But the same thing is true, even though when the application was made the risk is as supposed, provided that the insured learns of the change before the policy becomes binding. Wales v. N. Y. Bowery Fire Ins. Co., 37 Minn. 106, 33 N. W. 322. In Canning v. Farquhar, L. R. 16 Q. B. D. 727, although the insured informed the insurer at the time of making tender of the change in risk, the company had not withdrawn the offer to insure before the tender. The basis in that case of the judgment for the defendant was not that the offer was not outstanding when accepted, but that the character of the risk had changed before the policy went into effect, and that the insured knew of the change when he accepted it. The same rule was enforced in Equitable Life Ass'n Soc. v. McElroy, 83 Fed. 631, 28 C. C. A. 365 (C. C. A. 8th Cir.), in which the assured accepted after the risk had changed to his knowledge, but in which because he had not disclosed the change the court assimilated the facts to a case where there was fraud in the application itself.

There is no difference of judicial opinion so far as I can find upon the proposition that the insurer is not bound, where the insured at the time of the binding of the bargain had learned that the loss has happened or the risk has changed since the original application. The only difference between those cases and the case at bar is this: That here the insurer likewise knew that the loss had occurred, and nevertheless did not withdraw from the contract. This fact would perhaps be irrelevant in any case, even if the insurer did not formally withdraw his offer upon learning of the loss, for it might be held that to withdraw it after a loss has occurred would be an idle ceremony; but that question is not up at present, because the defendants had no knowledge that McIntosh had not bound the plaintiff to pay the premium, and that their own undertaking had therefore been without consideration from the outset. They certainly dealt with him in good faith, and were not called upon to disaffirm a contract which, so far as they knew, was binding upon them. If, however, it be once admitted that it was not binding upon them until ratified, it could not be ratified or accepted by paying a premium after the risk had ceased and the fundamental condition of the promise no longer existed. This would be quite obvious had the offer never been accepted at all, before the loss, but, if the policy was not binding while unratified, the situation was the same as though the offer had never been accepted.

[7] The plaintiff claims an attorney's fee under the Florida statute, but this is too clearly matter of procedure to require discussion. It is controlled by the lex fori. These cases were tried by the court after the special verdict was taken. The jury was in fact excused, but the record will read that the cause was adjourned till a day stated upon which the court directed a verdict for the proper party with costs, as indicated above.

Judgment will then be entered on that verdict for the plaintiff in the first two cases, and for the defendants in the last two.

### On Rehearing.

[8] These cases now come on for reargument upon my ¹omission to consider the resolution of December 16, 1908, which was as follows:

"It was moved, seconded and carried that T. M. McIntosh, as president of the company for a period of four months from the date hereof, be paid a salary of $62.50 per month for acting as the president of the company, and giving his time and services towards the preservation of the assets of the company and their disposition under the direction and control of the board of directors."

I do not mean to consider the effect of that resolution upon McIntosh's authority, because I think that he had no authority of any sort on the day when he took out the policies. The facts were these: He was elected president on December 16, 1908, and continued in office until March 11, 1909, from any aspect. The time fixed in the by-laws for the general election of officers was the first Wednesday of January, but no election was held on that day in the year 1909. No one disputes that McIntosh continued in office, since his term ran until his successor was appointed. A special meeting of stockholders was, however, held on March 8, 1909, in Jacksonville, Fla., in accordance with the formalities prescribed in the statute of Florida. No question is raised as to the regularity of the proceedings by which this meeting was called or of the election which then took place by which Morris Kline, E. A. Kline, and Joseph Fried were elected directors of the company. On March 11, 1909, Morris Kline and Fried met as directors of the company, with the knowledge and consent of E. A. Kline, and elected Morris Kline president and Fried secretary and treasurer. In spite of the formal demand for the surrender of the property of the corporation made on Rogers, the secretary, on the 11th, and upon McIntosh on the 12th, they continued in possession of the factory and of such books and papers as were not at the time in New York in possession of the Klines. On the 13th of March Morris Kline came to Quincy, Fla., to obtain possession of the property over which he had been elected president. His election had been perfectly regular, and there cannot be any question but that he was at the time de jure the only president. He found McIntosh absent at the time, but got possession of the keys from Schwartz under claim of right, but peaceably. He entered and remained in the building which contained the safe with the books in it until he was ejected. Towards evening McIntosh came in and learned from Schwartz that Kline was in the building and had the keys. McIntosh at once found him, and, after a few words, forced him at the point of a pistol to give the keys back to him. Upon the same day he took the books out of the safe and moved them to an attorney's office. McIntosh retained the forcible possession he acquired until after the fire. The policy was taken out on the 16th of March, and therefore after the events which I have mentioned.

Upon this state of facts I cannot doubt that McIntosh, whatever

his status between the 11th and the 13th of March, was thereafter merely a usurper, and a trespasser. On the argument, I had some doubts as to whether or not a corporate officer even when his successor has been elected might not remain de facto an officer of the company until he was in some way dispossessed of the office itself. The dictum in Thorington v. Gould, 59 Ala. 461, 469, is to the contrary of that, and so is Thompson on Corporations, § 3898, although the authorities there cited hardly bear out the learned author's statement, for in Lebanon & Royalton Gravel Road Company v. Adair, 85 Ind. 244, the holder of the note knew of the election of the successors. On principle the alternative is to allow two sets of officers to be vested with authority to bind the corporation, in spite of the legal termination of the powers of the first, and the corporation's act of supplying new officers in their place. At least there is no authority for such a position. However it may be in case the superseded officers still retain possession of the office—I purposely leave that term somewhat vague—there can be no doubt whatever, I think, that, once their successors have gained possession, they are out and cannot again become vested with any powers. Now Kline did get such possession lawfully and peaceably, for he got possession of the factory and all the property of the corporation. There was nothing else that he could get that would vest him with the office. It is true that McIntosh did not surrender it to him and so did not abandon the office, but that was not necessary, for the office did not depend upon McIntosh's will, but was terminable de jure without his consent. If that consent was necessary, it would have been impossible for Kline to have ever ousted him without legal proceedings, even if Kline had kept possession of all the indicia of office. Surely it cannot be possible for a superseded officer of a corporation to retain all his powers to bind the corporation after he has been dispossessed in every way that is physically possible, merely because he continues to assert his claim to be an officer. Nor is it of any consequence that Kline's possession only lasted for part of a day, for the law does not distinguish, once the possession has been peaceably and fully obtained. McIntosh's resumption of possession was violent, lawless, and without legal right. He was a trespasser as much as any one can be a trespasser, and it would be quite monstrous that the law should admit any validity to a possession acquired in that way.

It is true that the defendants never knew of Kline's temporary possession; but that is immaterial under the circumstances. It would be impracticable for a corporation to advise every one of the termination of its officers' authority, and the law does not require it. If they have once been dispossessed, so far as dispossession is possible that is as far as the corporation can go. No one can be held responsible for the criminal violence of others upon his person or upon his property, nor must a corporation at its peril advertise to all other persons that a former officer has regained his apparent authority by violence.

It is urged that Mining Company v. Anglo-Californian Bank, 104 U. S. 192, 26 L. Ed. 707, is to the contrary, but such is not the case.

The act of ratification of a de facto board of directors, illegally elected, was held valid against the corporation, because it occurred before a judgment of ouster against them was entered. The case is distinguishable for two reasons: First, because there is no evidence that there was a duly constituted board which was at the time exercising its office; second, because nothing had interrupted the continuity of the de facto board's tenure. Here both these things existed.

I adhere to my former disposition of the case, and will direct a verdict for the defendants.