Argued at Pendleton November 1, 1932; affirmed January 17;
rehearing denied February 14; motion for attorney
fee allowed April 18, 1933

# SPICER ET AL. *v.* BENEFIT ASSOCIATION OF RAILWAY EMPLOYEES

(17 P. (2d) 1107, 21 P. (2d) 187)

*George T. Cochran,* of La Grande (Cochran & Eberhard, of La Grande, on the brief), for appellant.

*R. J. Kitchen,* of La Grande, for respondent.

ROSSMAN, J. The principal assignment of error challenges orders of the circuit court which overruled the defendant's motion for a nonsuit and for a directed verdict. Let us review the evidence, more especially that portion of it favorable to the plaintiff which the jury had a right to believe.

■ Leslie V. Spicer, 36 years of age, was a machinist's helper. Prior to the alleged injury, which we shall now describe, he had always enjoyed good health and was a large, strong, powerful man. May 26, 1931, Spicer, while working at his employment, received an injury on the back of the middle finger of his left hand which inflicted a wound about three-fourths of an inch long and one-fourth of an inch deep. It bled freely and he at once repaired to the first-aid kit where he obtained some gauze dressing and mercurochrome with which he dressed the wound. A rule of the shop required all injured men to file written reports of any injuries received by them, but Spicer did not report the above incident. The evidence indicates, however, that the employees preferred not to report minor injuries. After dressing his finger, Spicer continued at his work the rest of the day and also the following day. Several acquaintances of his who saw him in the days following the above alleged accident swore that he wore a bandage upon his left hand. One testified that he "looked pale". Another swore that three or four days after the accident he noticed that a "red streak had started up his arm and a knot was under the arm". Another testified that he saw Spicer bathe his hand in warm water and that he

"was awful sick. He couldn't hardly lie down on the bed". The same witness said that Spicer at that time had such a severe chill that he wore his overcoat indoors, even though the day was warm. Still another described the lump under Spicer's arm as being the size of the metal end of a light socket. A witness who saw Spicer May 29th or June 1st testified that he "looked sick then—he sure did. * * * He had a horrible look on his face". He also testified that Spicer's left hand was in bandages and that, due to his inability to sleep, he was unable to obtain rest. Spicer's widow testified that his left hand had "become swollen and awful bad; hurt him so he couldn't sleep on account of it". She added that Spicer bathed it in hot water and suffered from it "quite a bit". As an additional remedy a hot-water bottle was applied to the hand. Mrs. Spicer testified: "I was up several nights all night long" with him, and added: "It got so bad it was all swelled up and red streaks went up his arm". She testified that more than one of these streaks extended the length of his arm and she, too, described the nodules in his arm pit. She swore that a few days after the alleged injury Spicer "had an awful fever". Dr. W. K. Ross, a physician in the employ of Spicer's employer, who was called as a witness by the defendant, testified that on May 27th he attended Spicer and continued to attend him thereafter until his death. He found "a little area of infection" upon the middle finger of Spicer's left hand which he lanced and from which he removed free liquid not in the nature of a core. He also found that on June 6th Spicer's temperature was 101 degrees. Upon his advice Spicer discontinued his work May 28th, and on June 10th was taken to a hospital in an ambulance.

The death certificates prepared by Dr. Ross, pursuant to the requirements of section 59-1207, Oregon Code 1930, which states: "The certificate of death shall contain the following items: * * * (17) Cause of death, including the primary and immediate causes and contributory causes or complications, if any, and duration of each * * *" recites: "The cause of death was as follows: Lymphangitis arm from hand infection, 6/5/31 * * * Contributory (secondary) bilateral lobar pneumonia, 6/10/31". August 21, 1931, Dr. Ross, in his own handwriting, answered a series of questions propounded to him by the defendant in a document entitled Attending Surgeon's Certificate. From it we quote: "7. State the immediate cause of death, and particularly describe injury causing same: Lymphangitis of left arm from hand infection. 8. State the remote and contributing cause of death: Bilateral lobar pneumonia". The witness not only freely admitted that he had made the answers just quoted but did not lessen their effect by explanation. Dr. James Haun, a physician called by the plaintiff, in answer to a hypothetical question which outlined the facts developed by the plaintiff's lay witnesses, expressed the opinion that the alleged injury to the middle finger of the left hand could have resulted in lymphangitis and thereby have caused the death. He also testified that lymphangitis was capable of lowering the vitality of the patient until a condition favorable to the development of pneumonia occurred. Dr. Mark Phy, another physician called by the plaintiff, to whom was also outlined the facts of Spicer's illness as described by the lay witnesses, testified that it was "quite possible" for Spicer to have thus contracted a "systemic infection that might cause his death". Upon cross-

examination, he amplified his answer thus: "Now, a man that has a history of an injury followed by red streaks up the arm and nodules in his arm pits, and then, after the usual inoculation period, suffers a systemic infection, it is quite probable, without some other evidence, that there is a definite relation to the primary wound". In a later answer, he added: "It is quite possible for a man to suffer from lymphangitis, and then have lobar pneumonia; that would cause death, following an injury of this kind. There usually enters in an inter-current infection. Most any of us in here could have lobar or any other type of pneumonia, if our resistance would not be capable of overcoming the natural infection that is constantly in our system. So if this man did actually have lymphangitis, it is quite possible it was the result of a lowered resistance in this man, and might have been responsible for the secondary or concurrent pneumonia which caused his death". Dr. Phy also testified that lymphangitis is regarded by medical men as "a very serious condition".

The defendant's answer did not concede that Spicer had sustained the alleged injury. Dr. Ross, the physician previously mentioned, testified that when he attended Spicer May 27th he found him suffering from "a condition which is known as general furunculosis"; that is, many boils or abscesses. According to his testimony, Spicer had "from six to ten of these small abscesses on each hand", and had consulted him two years previously about a similar condition. Dr. Ross testified that Spicer made no mention whatever of any injury. June 5th he saw Spicer again and found that the condition of his hands had greatly improved and that there was only one area which needed atten-

tion, being the back of the middle finger of the left hand which he lanced. He next saw Spicer June 6th. By this time the abscess was improved. "There was no free pus in it". June 8th he found "a little redness around the abscess and extending up the back of the hand". At that time, according to Dr. Ross, Spicer "appeared to be rather sick". His temperature was 101 degrees. He made an examination to determine the cause of the temperature and illness, but found no trouble in either the kidneys or the lungs. He testified: "It didn't look as though his hand was sufficiently infected to cause it"—that is, the temperature and the illness. He added: "The redness never extended beyond the region of the wrist", and that he found no swelled lymph nodes under the arm. June 10th he again saw Spicer. At that time he found him suffering from lobar pneumonia in the lower lobe of the right lung, and removed him to a hospital. The witness testified that the direct cause of Spicer's death was pneumonia, and that he stated in "the original death certificate" that lobar pneumonia was "one of the primary causes" of the death. In the certified copy of the death certificate, which he identified, the cause of the death was thus described: "The principal cause of death was as follows: Lymphangitis arm from hand infection, June 5, 1931. Bilateral lobar pneumonia, June 10, 1931". Seemingly, he believed that the boils, which he said he found on Spicer's left hand, had caused the lymphangitis, yet he agreed that a boil walls itself off and thus prevents its poisonous contents from entering the blood stream. Dr. Haun testified that the inflamed condition created by a boil is not lymphangitis but cellulitis. Dr. Clarence L. Gilstrap, a physician who was consulted by Dr. Ross June 17th concern-

ing Spicer's condition, testified that he saw no red streaks upon Spicer's left hand or arm, and that the cause of Spicer's death was lobar pneumonia. He noticed small purple spots on both of Spicer's hands which he believed were scars left by the alleged furuncular condition, and added: "This man did not have blood poisoning; I think we are absolutely certain of that". Mary E. Crandall, who, until three years before the trial, was the wife of Spicer, and who saw him twice during the above illness, testified that she had never seen him afflicted with any boils. Spicer's wife testified that he had never had any boils or abscesses upon his hand during the time that she knew him.

It will be observed from the above review of the testimony that the plaintiff claimed that Spicer had suffered a cut upon the back of the middle finger of his left hand May 26th or 27th; that shortly thereafter a condition of inflammation appeared in the left hand; that red streaks were seen along the length of his arm; that both his left hand and the lymph nodes became swollen; that Dr. Ross stated in his certificate that the immediate cause of death was "lymphangitis of left arm from hand infection"; and that "the remote and contributing cause of death was bilateral lobar pneumonia". It will also be observed from the above reviewed testimony that Dr. Phy was of the opinion it was "quite probable" for the injury to the hand to have caused lymphangitis, resulting in death. Both he and Dr. Haun testified that lymphangitis can lessen the patient's resistance sufficiently to cause him to contract lobar pneumonia.

■■ The assignment of error now under consideration presents the problem whether the wound upon the

left hand was shown by the evidence to have been the cause of the lymphangitis, which Dr. Ross' certificate assigned as the primary cause of Spicer's death. We are not concerned with the conflict of the testimony. The jury has considered that controversy and resolved it in favor of the plaintiff; hence we must assume that in the course of his employment Spicer injured his left hand in the manner described by the witnesses. Many decisions of the various courts are cited in the briefs which have considered the problem of liability under the provisions of an accident insurance policy where a slight injury caused a disease which subsequently resulted in the assured's death. We have read these decisions, but find it unnecessary to set forth our review of them because appellant's brief frankly concedes: "The defendant is liable where the disease is caused and brought about by the injury". This concession is well justified by the authorities. It was incumbent upon the plaintiff to prove that the injury bore to the disease the relationship of cause to effect, and not leave the solution of the issue to speculation and conjecture by the jury: *Goldfoot v. Lofgren,* 135 Or. 533 (296 P. 843). The mere fact that the contingency insured against followed in the wake of an accidental injury is not proof that the death resulted from the injury. The connection between the two must be proven with reasonable certainty: *Goldfoot v. Lofgren,* supra; *Frint v. Amato,* 131 Or. 631 (284 P. 183); *Lippold v. Kidd,* 126 Or. 160 (269 P. 210, 59 A. L.. R. 875); 17 C. J. 756. We believe that the aforementioned testimony established, with the required degree of cogency, the needed connection. The proof showed that the cut upon Spicer's hand could readily cause an infection. The evidence indicated that immediately

following the injury the wound became inflamed. The day following the injury Spicer consulted Dr. Ross. The latter applied treatments to the precise spot where the plaintiff's witnesses testified Spicer had suffered the injury. The treatments prescribed by the physician included directions to bathe the left hand in hot water and also to apply a hot water bottle. The physicians agree that these are the remedies usually prescribed for blood poisoning. Dr. Ross lanced the spot which the plaintiff's witnesses testified had become inflamed, and he removed from it pus. The hand became swollen. Red streaks were observed the length of the arm and the lymph nodes in the left arm became swollen. At the same time Spicer developed a temperature and became ill. According to the medical experts, all of these conditions were evidence of lymphangitis and such a condition, according to them, could cause death. The same condition was capable of lowering Spicer's resistance sufficiently to subject him to lobar pneumonia. Dr. Ross' certificate assigned lymphangitis as the primary cause of death and pneumonia as a contributing cause. This case is, therefore, not like *McCrosson v. Philadelphia Rapid Transit Company*, 283 Pa. 492 (129 Atl. 568), nor *Anton v. Chicago M. & St. P. Railway Company*, 92 Wash. 305 (159 P. 115) (both cited by the defendant) where the courts held that the causal connection between the injury and the resulting disease is not established by evidence which merely suggests that the result "might have" been caused by the disease. The above circumstances also differentiate this case from *Carnes v. Iowa State Traveling Men's Assn.*, 106 Iowa 281 (76 N. W. 683, 68 Am. St. Rep. 306), also cited by the defendant, where the plaintiff's evidence, with equal

cogency, showed that either one of two possible causes, for only one of which the defendant was responsible, might have caused the death. Likewise, this case is not similar to *Stanton v. Travelers' Insurance Co.*, 83 Conn. 708 (78 Atl. 317, 34 L. R. A. (N. S.) 445), also cited by the defendant, where the accident merely aggravated a previously existing disease which had already attained sufficient virulence to threaten the insured's life. The evidence reviewed above also distinguishes this case from *Trapnell v. City of Red Oak Junction,* 76 Iowa 744 (39 N. W. 884), and *Slack v. Joyce,* 163 Wis. 568 (158 N. W. 310), where the evidence wholly failed to prove that the accident was responsible for the diseased condition. The case before us is similar in essential features to *Western Commercial Travelers' Assn. v. Smith,* 29 C. C. A. 223 (85 Fed. 401, 40 L. R. A. 653), and *Cary v. Preferred Accident Insurance Co.,* 127 Wis. 67 (106 N. W. 1055, 5 L. R. A. (N. S.) 926, 115 Am. St. Rep. 997, 7 Ann. Cas. 484), in both of which the court found that the evidence established a causal connection between the injury and blood poisoning which ultimately resulted in death, and, therefore, held that the beneficiary of the policy was entitled to a recovery. Accordingly, we conclude that the verdict and judgment are supported by substantial evidence which establishes with reasonable certainty the wound of May 26th as the cause of death.

 The second assignment of error challenges the ruling of the trial court which overruled the defendant's objections to the hypothetical questions submitted to Drs. Haun and Phy. In support of this exception, the defendant argues that the questions sought the opinions of the witnesses upon the merits of the case. As will be observed from the foregoing review of the

testimony of these two witnesses, this criticism lacks support. The questions inquired concerning the capacity of the wound to create lymphangitis and the capacity of the latter to cause death. These questions were followed by others which inquired concerning the probability of death ensuing from the conditions described in the hypothetical questions. It will readily be seen that the witnesses were not asked for an opinion concerning the merits of the case. The credibility of the witnesses, the soundness of their judgment and the existence of the facts recited in the hypothetical questions remained as issues for the jury's determination. See *Goldfoot v. Lofgren,* supra. Nor do we believe that the questions are subject to the next attack urged by the defendant wherein it argues that these inquiries sought the conjectures of the two aforementioned medical experts. Conjectures, speculations and guesses are not admissible: *Storla v. S. P. & S. Transportation Co.,* 136 Or. 315 (297 P. 367, 298 P. 1065); *Scarpelli v. Portland Elec. Power Co.,* 130 Or. 267 (278 P. 99); Wigmore on Evidence (2d Ed.) 445. From the answers made by the four physicians who testified, it is evident that much knowledge has been acquired through medical science concerning the nature of lymphangitis and blood poisoning. The qualification of Drs. Haun and Phy to answer the questions propounded to them is not contested. Since medical science reveals much concerning lymphangitis and septicæmia, we believe that it is safe to assume that these two qualified witnesses could answer the questions propounded to them without resorting to conjecture and guesses. The questions concerned the capacity of a wound received by a mechanic while working upon grimy machinery to create a condition of lymphangitis.

It is a matter of common knowledge that physicians are frequently required to treat wounds received under such circumstances and to prevent resulting lymphangitis and septicæmia. The answers made by the witnesses indicate that they did not resort to guesses, but reverted to the experiences of medical men in treating such wounds and preventing ill after-effects. We, accordingly, conclude that the exceptions are without merit. This assignment of error reveals no error.

The next five assignments of error challenge five portions of the instructions of the court to the jury on the ground that in these portions of the instructions the court commented upon the facts, or assumed as facts, matters which were in issue. We have carefully studied these and the remaining parts of the instructions transcribed in the bill of exceptions. We are satisfied that the court submitted every issue of fact to the jury, and we also notice where it carefully cautioned the jury that all issues of fact were for the jury's exclusive determination. This being true, we find no error revealed by these assignments of error.

It follows from the foregoing that the judgment of the circuit court is affirmed.

RAND, C. J., BEAN and KELLY, JJ., concur.

Motion for attorney fee allowed April 18, 1933

ON MOTION FOR ATTORNEY FEE
(21 P. (2d) 187)

Cochran & Eberhard, of La Grande, for appellant.
R. J. Kitchen, of La Grande, for respondent.

ROSSMAN, J. The plaintiff (respondent), having prevailed upon the appeal, moves for the allowance of such sum as will constitute reasonable compensation to her attorney for the services performed by him subsequent to the filing of appellant's notice of appeal. Section 46-134, Oregon Code 1930, provides that in all actions upon policies of insurance, whether issued by an insurance company or a fraternal society, the plaintiff shall recover, in addition to the judgment upon the policy, reasonable compensation for his attorney, if it appears that the insurer failed to effect a settlement of its liability within six months from the day the proof of loss was filed, or failed to tender into court the amount recovered in the action. The foregoing and its antecedents have been the law of this

state since the 1919 legislative assembly. Pursuant to the provisions of that law, the circuit court allowed the plaintiff $300 as compensation for the services performed by her attorney in that court. In *Lewis v. Continental Casualty Co.*, 135 Or. 170 (295 P. 450), this court held that the act did not authorize the Supreme Court to award the insured compensation for the services performed by his attorney in sustaining in this court a judgment in his favor. Immediately thereafter the act was amended (1931 Session Laws, Chap. 355) by adding the following: "If attorney fees are allowed as herein provided and on appeal to the Supreme Court by the defendant the judgment is affirmed the Supreme Court shall allow to the respondent such additional sum as the court shall adjudge reasonable as attorney fees of the respondent on such appeal".

██ It will be observed that the amendment, like the act which it amended, subjects only insurers to the payment of attorney fees. Since only insurance companies are dealt with in that manner, and since the insurer is not permitted to recover a fee when it prevails, the defendant argues that the act violates article I, section 20, Oregon Constitution. That section of our constitution, based upon the conviction that in democracies discrimination by public bodies in their treatment of individuals similarly situated should not be tolerated, prohibits class legislation. However, whenever experience shows that an evil arises from the activities of some specific group, a remedy may be prescribed by legislative action, applicable only to those who form the evil-producing group, without violating constitutional restrictions. Hence, the question arises whether experience has shown that insurers display such a hostile attitude towards the payment of lawful

claims arising out of their undertakings that the legislature can properly subject them to the payment of attorney fees when their defense is unsuccessful, even though others are not dealt with similarly. Such legislation has generally been held valid: Cooley's Briefs on Insurance (2d Ed.), p. 6669; 6 R. C. L., Constitutional law, § 418, p. 422; 12 C. J., Constitutional Law, § 930, p. 1178; and annotation, 11 A. L. R., p. 900. The various reasons suggested in the decisions in favor of and against the validity of such legislation are reviewed in the above authorities. The decisions which have sustained the validity of such legislation mention the public interest in the prompt payment of insurance money, the vexatious attitude which some companies assume towards claims presented by policyholders after a loss has occurred, declare a belief that liability to the attorney fee is intended to spur the insurer to a prompt performance of its bounden duty, and still others find in such legislation an effort to overcome the economic advantage possessed and ofttimes improperly exercised by the insurers when the insured seeks payment of a claim. The reasons assigned in support of such legislation are criticized in *Williamson v. Liverpool & L. & G. Ins. Co.,* 105 Fed. 31, wherein the court held a Missouri statute, which permitted the court to add to the judgment 10 per cent damages and a reasonable attorney fee whenever it appeared that the insurer had vexatiously failed to pay a claim, conflicted with the 14th amendment to the federal constitution. The constitutionality of the Oregon legislation authorizing the assessment of an attorney fee has never before been questioned in this court, but its validity has been many times recognized: *Title & Trust Co. v. U. S. F. & G.*

*Co.,* 138 Or. 467 (1 P. (2d) 1100, 7 P. (2d) 805); *Lewis v. Continental Cas. Co.,* 135 Or. 170 (295 P. 450); *School Dist. 106 v. New Amsterdam Cas. Co.,* 132 Or. 673 (288 P. 196); *Dolan v. Continental Cas. Co.,* 133 Or. 252 (289 P. 1057); *Eaid v. National Cas. Co.,* 122 Or. 547 (259 P. 902); *Ocean A. & G. Corp. v. Albina M. I. Works,* 122 Or. 615 (260 P. 229); *M. Murray v. Firemen's Ins. Co.,* 121 Or. 165 (254 P. 817); *Johnson v. Prudential Life Ins. Co.,* 120 Or. 353 (252 P. 556); *Rosebraugh v. Tigard,* 120 Or. 411 (252 P. 75); *Walker v. Fireman's Fund Ins. Co.,* 114 Or. 545 (234 P. 542).

Since the validity of legislation subjecting insurance companies to liability for attorney fees when their defense upon their policies has been unsuccessful has been many times recognized by this court, and since it can reasonably be said that the litigation arising out of such policies presents features peculiar to insurance companies, we conclude that the 1931 act does not conflict with article I, section 20, Oregon Constitution.

The defendant argues that the title to the 1931 amendment violates article IV, section 20, Oregon Constitution, which provides: "Every act shall embrace but one subject, and matters properly connected therewith, which subject shall be expressed in the title * * *". The title to the 1931 act is: "To amend section 46-134, Oregon Code 1930". Section 46-134, Oregon Code 1930, was 1929 Session Laws, chapter 377, the title to which was: "To amend section 6355, Oregon Laws, as amended by chapter 184, General Laws of Oregon, 1927, relating to attorney's fees in suit or actions brought upon any policy of insurance". The title of 1919 Session Laws, chapter 110,

is "To provide for the collection of a reasonable attorney's fee in all suits or actions brought upon any policy of insurance in any of the courts of the state of Oregon". The court has held that the title of an amendatory act which states that it amends a section of our code specified therein does not conflict with article IV, section 20, Oregon Constitution, if the subject-matter of the original act was sufficiently expressed in its title, and if the subject of the amendatory act could have been included in the original act under its title. For a collation of our holdings see *State v. Eaton*, 119 Or. 613 (250 P. 233). The courts in other states operating under similar constitutional provisions have held to the same effect. See Cooley's Constitutional Limitations (8th Ed.), p. 318; 59 C. J., Statutes, p. 818, § 400; and 25 R. C. L., Statutes, p. 870, § 115. The subject-matter of the 1931 amendment could have been included under the title of the 1929 act, but since the title of the 1919 act uses the word "fee" and not "fees" the defendant argues that the title is defective. Such technical and critical constructions of the title is foreign to the purpose of this section of our constitution: 55 C. J., Statutes, p. 809, § 390. We find no merit in this objection of the defendant.

 The defendant next contends that the language of the 1931 amendment expresses a purpose to be prospective in operation and not retrospective. Having advanced this contention, it argues that the amendment has no application to the present policy of insurance which was written prior to the enactment of the 1931 law. It is true that the rules of statutory construction strongly favor a prospective interpretation of statutes which affect substantive rights, but when the new statute concerns itself merely with the laws of pro-

cedure or remedies, the statute is generally applied to existing rights as well as to those which may accrue in the future: *Denny v. Bean,* 51 Or. 180 (93 P. 693, 94 P. 503). See, also, *Joseph Filipkowski v. Springfield F. & M. Ins. Co.,* 206 Wis. 39 (238 N. W. 828, 78 A. L. R. 613) (annotated concerning the retroactive effect of insurance legislation). However, the paramount purpose of all rules of statutory construction is not to achieve some preconceived arbitrary objective, but to give effect to the legislative purpose. In the present instance the 1931 amendment indicates that the legislature itself considered and determined the manner in which the new law should be applied. The act provides: ''The terms of this act shall not apply to any suit or action started or begun prior to the passage of this act''. Thus, it is evident that the legislature intended that the act should be applied to all existing rights except those only which had already become the subject-matter of suits or actions. It is our opinion that the act should be applied to policies which were in effect at the time the 1931 amendment became effective.

This brings us to the contention advanced by the defendant that the act violates article I, section 10 of the Federal Constitution and article I, section 21 of the Oregon Constitution, both of which prohibit the enactment of laws impairing the obligation of contracts, and also the 14th amendment to the federal constitution. It will be helpful at this point to take note of the chronological order of the events which are material to the contention now before us. The policy was written March 1, 1924. Spicer was injured May 26, 1931, and died June 21, 1931. The complaint in the instant case was filed in the circuit court October 29, 1931,

and 1931 Session Laws, chapter 355, became effective June 6, 1931. This contention requires the court to determine the purpose of legislation of this kind and to decide whether such laws alter substantive rights or merely concern themselves with the remedies which jurisprudence affords for the redress of rights. The defendant seems to believe that laws of this kind attempt to amend policies of insurance by including in them a stipulation for the payment of an attorney fee. A Louisiana statute which required insurance companies to provide the insured with blank forms for making proof of loss, pay an attorney fee and damages to the extent of 12 per cent of the face of the policy when it developed that the company had failed to pay the sum promised in the policy within a period of time specified in the statute, was construed as a law affecting the right and not merely the remedy. The court pointed out that the requirement that the insurer supply all policyholders with forms for making proof of loss clearly could not be construed as anything but an attempt to alter the substantive rights of the parties: *Central Glass Co. v. Niagara Fire Ins. Co.*, 131 La. 513 (59 So. 972). But no person has a vested right in any particular mode of procedure or remedy, and accordingly a cause must be tried under the rules of procedure existing at the time of the trial, even though they may have been changed since the action was instituted. Thus, a new remedy of treating a refusal to pay alimony as a contempt of court may be applied to existing rights without invading constitutional limitations: *Judd v. Judd*, 125 Mich. 228 (84 N. W. 134). Likewise, the statutory right to have causes reviewed on appeal may be so altered, while the cause is on its way to the appellate tribunal, that the right is lost: *Simpson v. Winegar*, 122 Or. 297 (258 P. 562).

It will be observed that in practical operation the act before us, unlike the aforementioned Louisiana statute, will not bring to every policyholder some advantage in addition to those specified in his policy. It concerns itself only with those beneficiaries who secure an affirmance of their judgment after the insurer has transferred the cause to this court. Likewise, the act does not undertake to bring into the pockets of beneficiaries a sum greater than the amount promised to them by their policies, but merely endeavors to prevent that amount from being diminished by expenditures for legal services in actions caused by the unjust attitude of insurers. Insurance policies are generally obtained for specific purposes such as the rebuilding of a home destroyed by fire or the payment of a sum to one's dependents, and both parties to the policy calculate carefully the amount which will be needed so that the policy will yield enough and yet not be unduly burdensome. Therefore, when the insurer subjects the insured to litigation for the establishment of his rights, evil consequences are visited upon the insured different from those generally attendant upon legal action. Expenditures for attorney's services are an inevitable attendant of litigation, and the legislature evidently believed that it was right to impose this expense upon the party whose unwarranted failure to pay had created the necessity for the legal services.

Let us now see whether any help may be gained from a consideration of the holdings of other courts. In *Piedmont & A. Life Ins. Co. v. Ray,* 50 Tex. 511, the court construed a Texas statute which subjected life insurance companies, incorporated outside of that state but involved in litigation within the state, to the payment of a reasonable sum for an attorney fee to the

beneficiary, together with 12 per cent damages. It pointed out first: "Certainly the language here used seems much more appropriately to apply to losses to occur after the passage of the law than to such as had previously occurred, though they were still unpaid". Next, it expressed the opinion that the act would violate constitutional provisions protecting obligations of the contract if the act was applied to losses which had occurred before the enactment of the law. Finally, it declared: "Whether like constitutional objections will prevent a judgment for attorney's fees where the loss occurs after the enactment of the law, on a policy issued prior thereto, we are not now called upon to determine". A Missouri statute provided that, in any action against an insurance company to recover the amount of a loss under a policy which the company had vexatiously refused to pay, the court could allow to the plaintiff, in addition to the amount thereof, damages not to exceed 10 per cent on the amount of the loss and a reasonable attorney fee. In *Thompson v. Traders Ins. Co. of Chicago,* 169 Mo. 12 (68 S. W. 889), the court held that the statute governed the performance of the contract and not the remedy. Since the policy was written in Kansas where the insured property was located, and since the cause of action arose in that state, the court held that the statute had no application to the cause of action. In *Ayers v. Continental Ins. Co.,* 217 S. W. 550, the Missouri Court of Appeals, under facts similar to those in the case just mentioned, reached a similar result. A year later the Supreme Court of Missouri announced a like result in *First National Bank v. Security Mutual Life Ins. Co.,* 283 Mo. 336 (222 S. W. 832), where, according to the decision, it appeared: "This contract was made in Texas. Respondent is a resident of Texas, paid the

premiums there, and demanded performance of the contract in that state''. Since the Texas statute had neither been pleaded nor proved, the court awarded no relief under the Texas statute. It again expressed the opinion that the Missouri statute affects the right and not the remedy. In *American N. Ins. Co. v. Donahue,* 54 Okl. 294 (153 P. 819), the Oklahoma court held that a Texas statute, which authorized a court to allow not only an attorney fee but also to assess as damages an amount equal to 12 per cent of the face of a policy, should not be construed retroactively, and refused to apply the statute to a situation which was as follows: The policy was issued in 1908, the law was enacted in 1909, and the death occurred in 1911. In *Arkansas Mutual Fire Ins. Co. v. Woolverton,* 82 Ark. 476 (102 S. W. 226), the court held that a statute which authorized the allowance of an attorney fee and 12 per cent damages could not be applied to policies of insurance written prior to the enactment of the statute. It held: ''The statute, if it be valid, materially affects the contract of insurance''. See, to the same effect, *Arkansas Mutual Fire Ins. Co. v. Stuckey,* 85 Ark. 33 (106 S. W. 203). In *Central Glass Co. v. Hamburg-Bremen Fire Ins. Co.,* 133 La. 598 (63 So. 236), the court held that a Louisiana statute authorizing the award of 12 per cent damages and a reasonable amount for attorney fees did not apply to policies issued before the law became operative, and that if it were so applied it would be invalid, as one that impaired the obligation of contracts. See, to same effect, *Central Glass Co. v. Niagara Fire Ins. Co.,* 131 La. 513 (59 So. 972), and *Guardian Fire Ins. Co. v. Central Glass Co.,* 114 C. C. A. 639 (194 Fed. 851) (construing the Louisiana statute in harmony with the effect given it in the aforementioned Louisiana decisions).

It will be observed that the statutes before the courts in the foregoing cases required the insurer to do something more than pay an attorney fee. We now come to several cases where the statute required nothing more than the payment of an attorney fee. In *Peterson v. Jahn Contracting Co.*, 96 Wash. 210 (164 P. 937), the court held that no attorney fee was recoverable in an action upon a surety bond written before a legislative enactment went into effect which provided that in actions upon such instrument the court could allow an attorney fee "in addition to all other costs". The court said: "But whatever this attorney fee be termed—costs or something else—it is an attempt to place a substantial liability on the bonding company which it did not contract to assume". In *People of Sioux County, Nebraska, v. National Surety Co.*, 276 U. S. 238 (48 S. Ct. 239, 72 L. Ed. 547), the federal Supreme Court expressed an inclination to take a similar view of the nature of an attorney fee. In that case a county brought an action in the federal district court upon a bond given by a national bank to assure payment of a deposit made by the county in the bank. In holding that the county could recover an attorney fee under the Nebraska statute, the court was inclined to believe that the attorney fee was not merely an item of costs and, hence, limited in amount to the sum mentioned in the federal statutes governing costs assessed in federal courts. In *Bullard v. Smith*, 28 Mont. 387 (72 P. 761), the court held that a Montana statute which permitted negotiable instruments to contain a provision for the payment of attorney fees affected the remedy only and that, therefore, it did not conflict with the provision of the Montana constitution which prohibited

the enactment of legislation "impairing the obligation of contracts". In *Kline Bros. & Co. v. Royal Ins. Co.,* 192 Fed. 378, the court held that a statute providing for the allowance of an attorney fee to a plaintiff in his action against an insurance company related solely to a matter of procedure, and hence did not affect an action in another state. In *Manhattan Wholesale Grocery Co. v. Insurance Co.,* 92 Kan. 336 (140 P. 853), and *Alliance Cooperative Ins. Co. v. Corbett,* 69 Kan. 564 (77 P. 108), the courts held that the following provision of the Kansas statutes: "The court in rendering judgment against any insurance company on any such policy of insurance shall allow the plaintiff a reasonable sum as attorney's fee, to be recoverable as a part of the costs" affected only the remedy. The courts of Nebraska have consistently adhered to the view that a statute of that state which permits the insured to recover "a reasonable sum as attorney's fees to be taxed as a part of the costs" governs only the remedy and, hence, does not violate constitutional limitations when applied retrospectively: *Reed v. American Bonding Co.,* 102 Neb. 113 (166 N. W. 196, L. R. A. 1918C, 63); *Ward v. Bankers' Life Co.,* 99 Neb. 812 (157 N. W. 1017); *Nye-Schneider-Fowler Co. v. Bridges, Hoye & Co.,* 98 Neb. 863 (155 N. W. 235); *American Fire Ins. Co. v. Landfare,* 56 Neb. 482 (76 N. W. 1068). Compare *Sharpe v. Grand Lodge A. O. U. W.,* 108 Neb. 193 (188 N. W. 100, 189 N. W. 176). In *Dowell v. The Talbot Paving Co.,* 138 Ind. 675 (38 N. E. 389), the court held that a statute allowing an attorney fee in proceedings for the foreclosure of contractors' liens did not violate constitutional limitations protecting vested rights when retrospectively applied because it merely affected the remedy for the enforcement of rights which had

already been conferred by previous legislation granting a lien to the contractor. In *Germania Fire Ins. Co. v. Bally,* 19 Ariz. 580 (173 P. 1052, 1 A. L. R. 488), the court held that a statute which authorized the award of an attorney fee to the insured, together with 15 per cent damages, where a fire insurance company had failed to pay a loss after the proper demand, did not violate constitutional limitations when retrospectively applied. It held that the statute was an exercise of the police power of the state for the promotion of the general welfare, and that the insurance business is subject to that power.

Thus, we see that, apart from the Washington decision which concerned a surety bond, the only decisions which hold that such statutes cannot be retrospectively applied without violating constitutional limitations concerned law authorizing not alone the exaction of an attorney fee but also substantial damages, and that in one instance the statute imposed upon the insurance company a further duty to supply all policyholders with printed forms for the preparation of proofs of loss.

The 1931 amendment authorizes the imposition of nothing more than an attorney fee and concerns itself solely with cases on appeal to the Supreme Court.

We have observed from the foregoing that the courts incline to the view that the award of an attorney fee becomes an item of costs. Section 7-601, Oregon Code 1930, which was a part of the enactments adopted in 1862, provides: "The measure and mode of compensation of attorneys shall be left to the agreement, express or implied, of the parties; but there may be allowed to the prevailing party in the judgment or decree certain sums by way of indemnity for his attorney fees in maintaining the action or suit, or

defense thereto, which allowances are termed costs''. Section 7-605, Oregon Code 1930, which was in effect prior to the issuance of the aforementioned policy of insurance, specifies the amount of the attorney fee recoverable as costs. It allows $15 to the prevailing party on appeal. Costs are in the nature of incidental damages allowed to the successful party to indemnify him against the expense of asserting his rights in court, when the necessity for so doing was caused by the other's breach of a legal duty. Thus, before the enactment of the 1931 amendment our laws had already permitted the prevailing party to recover an attorney fee. The 1931 act, therefore, did not create a new liability but merely made the old liability flexible in the expectation of being just. It is possible that the amount allowed through the exercise of judicial discretion contemplated by the 1931 act might award in some instances less than the $15 previously awarded by section 7-605. This court has three times recognized the fact that the attorney fees recoverable under circumstances similar to those now before us are cost items: *Johnson v. Prudential Life Ins. Co.*, 120 Or. 353 (252 P. 556); *Title Guarantee & Trust Co. v. Wrenn,* 35 Or. 62 (56 P. 271, 76 Am. St. Rep. 454); *Bank of Ogden v. Davidson,* 18 Or. 57 (22 P. 517). See, also, 33 C. J., Insurance, p. 146, § 894, and 7 R. C. L., Costs, p. 792, § 17.

We believe that the award of the attorney fee can properly be considered as nothing more than the imposition of a cost item for which there was already a liability prior to the enactment of the 1931 amendment, and that, hence, when the statute is retrospectively applied it does not conflict with the constitutional limitations to which the defendant has directed our attention.

There is still another reason why this act does not become invalid when retrospectively applied. The amendment authorizes the award of an attorney fee only in causes which have been appealed to this court and have been affirmed by it. It is a burden imposed upon the privilege of appeal to this court. At common law appeals were unknown and, as we have many times pointed out, our constitution contains no guarantee of review by the process of appeal. Appeal is, therefore, a statutory privilege and not a common law or constitutional right. Such being its nature, the legislature may in its discretion prescribe in what manner appeals may be taken and what limitations may be imposed upon the privilege: Cooley's Constitutional Limitations (8th Ed.), p. 840; 3 C. J., Appeal and Error, p. 318, § 30; 2 R. C. L., Appeal and Error, p. 28, § 5. The burden which the 1931 amendment imposes upon the privilege of seeking appellate review casts the expense of attorney fees upon the unsuccessful insurer-appellant. Apparently the legislature was persuaded that, since the one party or the other would be compelled to discharge this expense, it was just that the insurance company should bear it, since its unwarranted attitude had created the necessity for the legal services. Manifestly the expense will never be so great that any insurance company will abandon the privilege of an appeal rather than subject itself to the hazard of having the attorney fee imposed upon it. Hence, the statute cannot be construed as an effort to deprive insurance companies of due process of law if we should grant that due process of law includes a right to appellate review. *Clay v. Clay*, 56 Or. 538 (108 P. 119, 109 P. 129), is authority for the proposition that due process of law does not demand a right to

appellate review. We, therefore, conclude that the statute is valid when retrospectively applied.

■ The question now occurs what sum should be allowed the plaintiff as reasonable compensation for the services rendered by her attorney in this court. The jury awarded her $300 as compensation for her attorney's services in the circuit court. The statute does not contemplate the introduction of testimony in this court and evidently presumes that we will be governed by the facts which of necessity come to our attention in the examination of the case (*Sherwood v. Wise,* 132 Wash. 295 (232 P. 309, 42 A. L. R. 1219)), after having applied to them the commonplace rules which govern the measurement of attorney fees. They are reviewed in *Schmalz v. Arnwine,* 118 Or. 300 (246 P. 718). However, in an action of this kind the size of the fee is not to be determined as though it were a speculative or contingent one: *Merchants' Fire Ins. Co. v. McAdams,* 88 Ark. 550 (115 S. W. 175). The facts and circumstances which have come to our attention in the presentation of the cause in this court enable us to determine in a satisfactory manner the value of the services of the plaintiff's attorney rendered subsequent to the recovery of judgment in the circuit court; for instance, we heard his argument before this court; we have examined his brief, etc. Other courts have held that such services, within the presence and knowledge of the court, constitute evidence from which the court, unaided by opinion of others as to value, or even in defiance of such opinion-evidence, may reach a conclusion: *Larscheid v. Kittell,* 142 Wis. 172 (125 N. W. 442, 20 Ann. Cas. 576) ; *Tullgren v. Karger,* 173 Wis. 288 (181 N. W. 232) ; *Crutcher v. Sims,* 184 Mo. App. 488 (170 S. W. 430) ; *Farley v. Geisheker,*

supra. The transcript of evidence was short; the assignments of error were few in number; the questions of law were not difficult; the amount involved was $2,700; and the presentation of respondent's defense to this court displayed no unusual labors. It seems to us that in the presentation of any cause of ordinary importance before this court an attorney's fee of $150 is a reasonable amount. The plaintiff may, therefore, add that amount to the costs awarded to her on appeal.

██ In the respondent's cost bill we find this item: "Copy of transcript of evidence, $18.00". The appellant has moved to strike that item. The motion should be and is allowed. *J. A. Campbell Co. v. Corley,* 140 Or. 462 (3 P. (2d) 776, 13 P. (2d) 610, 14 P. (2d) 455).

RAND, C. J., and BEAN, J., concur.

KELLY, J., (dissenting.) The question here is not whether attorneys are entitled to a reasonable compensation for their services. No thinking person could or should withhold from them the benefit of the scriptural injunction that "a laborer is worthy of his hire". Luke x, 7; 1 Tim. v, 8. Neither is it a matter of construing a statute allowing an attorney's fee in cases wherein an insurance company not acting in good faith interposes a defense as in the case of *Supreme Ruling of the F. M. C. v. Snyder,* 227 U. S. 497 (57 L. Ed. 611, 33 S. Ct. 292).

As the writer understands the prevailing opinion, it holds that the allowance of $150 as an attorney's fee on appeal in a case involving a contract for the payment of $2,700 is either a mere procedural incident to be regarded as only another item of costs, which costs also include an attorney's fee of $300

allowed by the trial court; or the exaction of a condition prerequisite to the right of an insurance company to prosecute an appeal to this court.

"The obligation of a contract depends upon its terms and the means which the law in existence at the time [of its execution] affords for its enforcement". *State Tax on Foreign-held Bonds*, 15 Wall (U. S. 300, 320 (21 L. Ed. 179).

The writer thinks that a statute authorizing the recovery of an attorney's fee in insurance cases should not be given retroactive effect.

The courts of Nebraska and Arizona hold that retroactive effect should be given. *Nye-Schneider-Fowler Co. v. Bridges Hoye & Co.*, 98 Neb. 863 (155 N. W. 235); *American Fire Insurance Co. v. Landfare*, 56 Neb. 482 (76 N. W. 1068); *Ward v. Bankers' Life Co.*, 99 Neb. 812 (157 N. W. 1017); *Germania Fire Ins. Co. of N. Y. v. Bally*, 19 Ariz. 580 (173 P. 1052, 1 A. L. R. 488).

In Nebraska, however, we find the court saying:

"If the question that we are considering was now presented for the first time, we would hesitate to say that this statute does not create and add to the contract a legal liability which would not exist under the contract prior to the enactment of this statute". (*Nye-Schneider-Fowler Co. v. Bridges,* supra.) And also: "The reasons advanced for this contention on the part of the defendant [i. e. that the statute should not be given retroactive effect] and the manner in which they are presented in this brief, might well cause us to hesitate if the question was an open one". *Reed v. American Bonding Co.*, 102 Neb. 113 (166 N. W. 196, L. R. A. 1918C, 63).

*Bullard v. Smith*, 28 Mont. 387 (72 P. 761), merely holds that notes, which were declared by a statute to be nonnegotiable because they contained a clause pro-

viding for the payment of an attorney's fee in case of suit, could be rendered negotiable by a subsequently enacted statute. It will be noted that the only effect of this doctrine is that certain defenses given by the earlier statute were withheld by the later legislation. No question was involved concerning the payment of a substantial or any sum of money not mentioned in the original contract.

The Kansas cases cited in the opinion of the court do not involve the question whether statutes providing for attorneys' fees in insurance cases may be given retroactive effect.

In the Indiana case cited therein, we find this statement:

"We are of opinion that the amended seventh section of the act of 1889, in conferring the right on the contractor to foreclose his lien and to recover a reasonable attorney's fee did not impair any vested right or constitutional guaranty. It simply provided a remedy for the enforcement of a right which had already been created by the act of 1889 in conferring on the contractor a lien. That act had already made the abutting property liable to a lien in favor of the city, the contractor, and the holders of certificates or bonds issued under the act on account of street improvements for the contract price of such improvements, and had conferred the right on the city and on the holders of such certificates or bonds to maintain a suit to foreclose the lien as a mortgage and to recover an attorney's fee therein.

"As we have already seen, the right given the city and the holders of the bonds or certificates to foreclose and recover attorney's fees was for the benefit of the contractor. The extension of the remedy to the contractor did not create any new right, nor did it impose a new burden on the abutting property. Such property was already subject to that burden, subject to foreclosure and attorney's fees". *Dowell v. Talbot Paving Co.,* 138 Ind. 675 (38 N. E. 389).

In *Kline Bros. & Co. v. Royal Ins. Co.,* 192 Fed. 378, the New York Federal court refused to apply a Florida statute authorizing the allowance of an attorney's fee. The question discussed herein was not there considered.

The courts of Louisiana, Arkansas, Oklahoma, Missouri and Texas hold that retroactive effect should not be given to such statutes as the one under consideration. *Guardian Fire Ins. Co. v. Central Glass Co.,* 114 C. C. A. 639 (194 Fed. 851) (construing La. Act of 1908, No. 168); *Central Glass Co. Ltd. v. Niagara Fire Ins. Co.,* 131 La. 513 (59 So. 972); *Central Glass Co. v. Hamburg-Bremen Fire Ins. Co.,* 133 La. 598 (63 So. 236); *Arkansas Mut. Fire Ins. Co. v. Woolverton,* 82 Ark. 476 (102 S. W. 226); *Arkansas Mut. Fire Ins. Co. v. Stuckey,* 85 Ark. 33 (106 S. W. 203); *American N. Ins. Co. v. Donahue,* 54 Okla. 294 (153 P. 819); *Thompson v. Traders' Ins. Co.,* 169 Mo. 12 (68 S. W. 889); *Piedmont & A. Life Ins. Co. v. Ray,* 50 Tex. 511.

"The allowance of an attorney's fee relates to the right and not to the remedy". *First Nat. Bank v. Security Mut. Life Ins. Co.,* 283 Mo. 336 (222 S. W. 832). See, also, *Ayers v. Cont. Ins. Co.,* 217 S. W. 550.

The fact that in the cases refusing to give retroactive effect to statutes providing for damages *and* attorneys' fees, the courts did not allow attorneys' fees renders those cases decisive of the very question here involved; for the reason that it is elementary that any part of the statute which is constitutional is unaffected by those parts thereof which are unconstitutional. If the courts mentioned had deemed the allowance of attorneys' fees to be warranted under a subsequently enacted statute, they would have so declared even though refusing to uphold the allowance of damages.

In the opinion of the writer, the doctrine is unsound that, where the statute prescribes that an attorney's fee shall be a part of the judgment, it thereby becomes a part of the costs. The case of *Title Guarantee & Trust Co. v. Wrenn,* cited in the opinion of the court, construed a statute which expressly declared that "the court shall, upon entering judgment for the plaintiff, allow as part of the costs * * * a reasonable amount as attorney's fees". *Johnson v. Prudential Life Insurance Co.,* also cited in the opinion of the court, held that—

"The attorney's fee provided by the statute is to be allowed as part of the costs and expenses of the litigation".

That case was decided before the decision was rendered in the case of *People of Sioux County Nebraska v. National Surety Co.,* 276 U. S. 238 (48 S. Ct. 239, 72 L. Ed. 547), wherein, construing a similar statute of Nebraska (Section 7811, Comp. Stat. Neb. 1922), the Supreme Court of the United States used this language:

"That the statute directs the allowance, which is made to plaintiff, to be added to the judgment as costs are added, does not make its costs in the ordinary sense of the traditional, arbitrary and small fees of court officers, attorneys', docket fees and the like, allowed to counsel by R. S. §§ 823, 824. The present allowance, since it is not costs in the ordinary sense, is not within the field of costs legislation covered by R. S. §§ 823, 824. That the particular mode of enforcing the right provided by the state statute—i. e., by taxing the allowance as costs—is not available to the federal courts under R. S. §§ 823, 824, does not preclude the recovery. Since the right exists, the federal courts may follow their own appropriate procedure for its enforcement by including the amount of the fee in the judgment".

To the writer, the foregoing constitutes an unequivocal statement that the recovery of an attorney's fee, under such statutes as those being considered, is a matter of substantive right; and, therefore, the statutes, creating that right, ought not to be construed as being merely remedial in character.

The writer thinks that whether the statute in question is remedial or not, the provision thereof for attorneys' fees upon appeal, which was not in effect when the contract of indemnity was executed, cannot be applied to such contract without violating the constitutional inhibition against impairing the obligation of contracts. Article I, section 10, Constitution of the United States, Article I, section 21, Constitution of Oregon. To the writer, there is no difference between applying to a contract such a legislative mandate enacted subsequent to its execution, and at such time writing therein a clause providing for an attorney's fee.

"Whatever belongs merely to the remedy may be altered according to the will of the state, provided the alteration does not impair the obligation of the contract. But if that effect is produced, it is immaterial whether it is done by acting on the remedy or directly on the contract itself. In either case it is prohibited by the constitution". *Bronson v. Kinzie,* 1 Howard 311.

The obligation of the contract in suit was to pay the amount of the policy and a reasonable attorney's fee. Applying the amendment of the statute passed after the execution of that contract, the obligation thereof becomes enlarged to the extent of requiring the payment of a second and additional attorney's fee.

While there is authority to the contrary, the United States Supreme Court has held that—"The right of appeal must be reciprocal, and the statute does not

give to one party an advantage over the other party under the same circumstances". *The Sydney and The William Worden et al. v. Providence Washington Ins. Co. et al.,* 139 U. S. 331 (11 S. Ct. 620, 35 L. Ed. 177). In this kind of a case the writer thinks that such holding is salutary. Too many policies of insurance have been veritable tinder boxes, although proof thereof has not been available, for this court to confine its sympathy to the honest victims of fires without taking into account the other losses occurring to the insurers and their stockholders by reason of the villainy of the insured. The writer knows by experience what it means to suffer loss by fire and no one sympathizes more keenly than he with those who through no fault of theirs sustain such loss; but many cases arise where arson is far more profitable to the insured than either liquidation or a continuance in business. In mentioning this sordid fact, the writer disclaims any intention to intimate that plaintiff herein is other than honest, honorable and fair.

Cases holding that the right of appeal must be reciprocal and to the contrary are collated in the notes to section 465, page 616 of the 3d volume of C. J., under the title Appeal and Error.

If the right of appeal must be reciprocal, and in the absence of some special or unusual circumstance or relationship it is only just that it should be, the imposition upon one party of a condition as a prerequisite thereto, not required of the other party, cannot be logically upheld, as suggested, on the ground that the right of appeal is wholly statutory and what the legislature has given the legislature may take away.

The motion for an allowance of an attorney's fee upon appeal should be overruled.